*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RONNY M., | ) | |
| | ) | Supreme Court No. S-14558 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-10-11884 CI |
| v. | ) | |
| | ) | O P I N I O N |
| NANETTE H., | ) | |
| | ) | No. 6783 – May 31, 2013 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: Ronny M., pro se, Lake Placid, Florida, Appellant. Nanette H., pro se, Palmer, Appellee.

Before: Fabe, Chief Justice, Stowers and Maassen, Justices. [Carpeneti and Winfree, Justices, not participating.]

STOWERS, Justice.

## I.      INTRODUCTION

This appeal concerns the custody and child support arrangement between Ronny M. and Nanette H.[1] with respect to their two minor children, Ronny Jr. and Lavar, both of whom were born in Florida. Ronny and Nanette dated for several years after the births of their children but broke up in 2002 following a significant history of domestic

---

[1]      To protect the family's privacy, we use initials instead of full last names.

violence by Ronny against Nanette, including at least three domestic violence convictions. In 2002 the Florida Department of Children and Families became involved in the matter and set up a case plan that significantly limited Ronny's visitation rights. Ronny complied with the case plan and eventually worked his way up to unsupervised visitation with the children, but in 2007 he stopped seeing or contacting them altogether. In 2009 Nanette married and moved to Alaska with the children without informing Ronny.

In 2010 Nanette filed a complaint in which she sought sole legal and primary physical custody of the children. Nanette also requested child support. Ronny opposed, requesting that the parties share joint legal custody and that he be awarded primary physical custody. The superior court held an evidentiary hearing over the course of two days in May and August 2011. At the conclusion of the hearing the superior court awarded primary physical custody to Nanette and a modified form of joint legal custody to Nanette and Ronny, with Nanette having final decision-making authority should the parties fail to agree on major decisions affecting the children's welfare. The superior court also granted Ronny summer visitation rights, provided that he pay for the travel expenses, and ordered Ronny to pay child support. Ronny appeals.

For the reasons explained below, we affirm the superior court's child custody award. We affirm the child support award but reverse and remand regarding the allocation of visitation expenses. We affirm the superior court in all other respects.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Ronny M. and Nanette H. began dating in Florida in 1998 when they were both 16. They are the parents of two minor children: Ronny Deion Jr., born in October 1999 in Lake Placid, Florida, and Lavar Eugene, born in November 2000, also in Lake Placid. Ronny and Nanette dated intermittently for five years; they never married.

Nanette testified that Ronny was abusive toward her throughout the duration of their relationship.[2] In June 2002 Ronny was arrested for assaulting Nanette. That same month Nanette obtained a temporary injunction for protection against domestic violence that prohibited Nanette and Ronny from contacting one another and that granted Nanette temporary custody of the children. Nanette subsequently reconciled with Ronny and sought to have the injunction dismissed, but it appears her efforts were unsuccessful. Later that year Ronny was twice arrested for committing two separate acts of domestic violence against Nanette. Ronny was convicted in all three instances.

The Florida Department of Children and Families (Department) intervened following Ronny's third arrest in September 2002 and petitioned a Florida court for an emergency shelter hearing. The court allowed Nanette to retain custody of the children, provided that she did not contact Ronny or allow him to see the children. Nanette and the boys moved into a shelter per court order and remained there for a few months.

The Department set up a case plan with which both Ronny and Nanette substantially complied. Ronny completed a batterer's intervention program, a parenting program, and a psychological evaluation as required by the case plan. In 2003 Ronny was awarded supervised visitation with the children, and he soon worked his way up to unsupervised visitation every other weekend.

Ronny remained involved in the boys' lives until April 2007, at which point he stopped seeing them altogether. Nanette obtained her nursing degree in 2008, and in 2009 she married her husband, Robert H. Nanette, Robert, and the boys moved to

---

[2]     Nanette testified that Ronny was first arrested for assaulting her when she was pregnant with Lavar and spent ten months incarcerated for the incident, but she was unable to obtain certified copies of the records because Ronny was a juvenile at the time of his arrest and incarceration.

Alaska later in 2009, and Robert and Nanette had their own child in Alaska in 2010.[3] Nanette did not inform Ronny of their move. Ronny continues to live in Florida.

## B. Proceedings

In November 2010 Nanette filed a complaint with the superior court in Anchorage seeking primary physical and sole legal custody. She also requested child support. Ronny filed an answer and asked that he be awarded primary physical custody and that the parties share joint legal custody.

In January 2011 Ronny moved for interim relief asking for "weekly or open phone communication" and shared physical custody. Ronny asserted that Nanette had made it impossible for him to communicate with his children, but he wanted to reestablish involvement in their lives. Nanette opposed Ronny's motion and argued that the children should stay in her custody, citing Ronny's multiple domestic violence convictions. Nanette also expressed fear that if the boys were sent to Florida to visit Ronny, he might never send them back to Alaska. In addition to the motion for interim custody, Ronny filed a motion to show cause and a motion to transfer the case to Collier County, Florida; Nanette moved for appointment of a guardian ad litem.

In April 2011 Superior Court Judge Eric A. Aarseth granted Ronny's motion in part. Noting the history of domestic violence and the geographic separation, the superior court awarded Nanette interim sole legal and primary physical custody. The court awarded Ronny telephonic visitation with the boys two times per week between 6:00 p.m. and 7:00 p.m. The court denied the other three motions.

The superior court held a two-day evidentiary hearing in May and August 2011 at which Nanette appeared with limited representation and Ronny appeared pro se. At the first hearing Nanette reiterated her request for sole legal and primary physical

---

[3]     Nanette also has a son from another relationship.

custody, with either no visitation or supervised visitation for Ronny. Nanette testified that it was in the boys' best interests to remain in her custody because they had been in her care for their entire lives and were very bonded with her. Nanette also testified that it was in the children's best interests to relocate to Alaska. Nanette stated that her husband, Robert, worked on the North Slope, and moving to Alaska enabled them to stop paying for plane tickets between Alaska and Florida. Nanette also stated she was able to earn a higher wage as a nurse in Alaska, though in the past few years she had only been working six days a month in order to spend more time with her family. Nanette testified that both of the boys had been falling behind in school in Florida and had to be held back, but that their grades had significantly improved since moving to Alaska. Nanette stated that the boys were involved in Boy Scouts, basketball, track, and football, and were doing "wonderful."

Nanette also testified that Ronny voluntarily chose not to exercise his visitation rights during the last two years she and the boys were living in Florida. Nanette stated that Ronny initially complied with the visitation schedule set up by the Florida case plan, but after the case closed Ronny stopped picking up the boys at the specified times. Nanette testified that she did not tell Ronny she and the children were leaving Florida or immediately inform him of their whereabouts because he had not exercised his visitation rights for the two previous years and because she was afraid of him.

At the conclusion of her testimony Nanette reconsidered her initial statements regarding visitation. Nanette stated that the reason she did not want Ronny to have regular visitation with the boys was because he had often disappointed them in the past and she was concerned they would be hurt again. Nanette explained that when the interim visitation was first ordered the boys did not want to talk to their father, but they had recently become increasingly interested in reestablishing a bond with him.

Nanette testified that if she and the boys were to travel to Florida to visit her family, she would agree to allow the boys to see their father.

Ronny testified telephonically from Florida. He requested shared physical custody, with the children spending six months in Florida and six months in Alaska. When pressed as to what the children would do for school under his proposed custody schedule, Ronny requested that the boys spend every other year and alternate holidays with each parent.

Ronny testified that he was involved in his children's lives to the extent that Nanette and the court would allow him. Ronny stated that he had tried to communicate with Nanette as soon as the no-contact order was lifted, but he did not know her contact information. Ronny explained that Nanette's father informed him in August 2010 that Nanette and the boys had moved to Alaska, but her father would not give him their address. Ronny testified that he had tried to file a custody action in Florida, but he had no address at which to serve Nanette. Ronny asserted that he was doing everything he could to reach out to his boys and to be a part of their lives, but Nanette was making it impossible.

The parties also disputed the extent to which Ronny was exercising his interim visitation rights. Nanette submitted her phone records in support of her testimony that Ronny often waited until the end of the designated hour to call or failed to call altogether. Nanette acknowledged that she typically did not answer her phone if Ronny called outside of the designated times. Ronny accused Nanette of violating the interim order and asserted that Nanette would often interrupt his phone calls with the boys by telling them to do things while he was on the phone. Ronny also explained that he did not call right at the time specified by the order because he wanted to give Nanette's family a chance to eat dinner and because he sometimes had to get his other children to bed in Florida.

The parties also discussed child support. Nanette testified that Ronny only paid $274 per child in 2010, all of which came from his social security payments. Ronny testified that he was completely unable to work because of renal failure and he relied entirely on social security and disability payments for his income.

Ronny also attempted to submit into evidence a tape of a December 1, 2010 phone conversation he had with Nanette's father, Donald P., which was recorded without Donald's permission. Ronny alleged that Donald stated on the recording that he would not give Nanette's address in Alaska to Ronny because Nanette did not want him to have it, and that Donald acknowledged on the recording that he did not condone Nanette's actions. The superior court elected to call Donald to testify rather than to play the tape.

Donald testified that Nanette had a very good relationship with her sons, and he described her as a loving parent. When asked if he thought the move to Alaska was in the children's best interests, Donald stated that he knew the boys were in a good environment and happy there. Donald testified that he thought, given the job opportunities, Nanette made the right choice for her family by moving to Alaska. Donald asserted that Ronny was not providing for the boys and had not "stepped up to the plate" insofar as they were concerned.

Ronny's girlfriend, Nichole S., also testified telephonically from Florida. She stated that she and Ronny started dating in 2001 and had three children together. Nichole testified that Ronny Jr. and Lavar had very good relationships with their father, with their half-brothers, and with her.

Nichole testified that Ronny and Nanette initially did not have any problems sharing custody of the boys in Florida, with Ronny and Nichole taking the boys every other weekend, and that she would often communicate with Nanette since Ronny and Nanette were prohibited from contacting one another. But, Nichole testified, in April 2007 Nanette and Ronny had a miscommunication about picking the boys up from

school.  According to Nichole, Nanette got frustrated with the situation and sent Nichole a text message stating that Ronny would not see his boys again.  Nichole asserted that she and Ronny called, texted, and left messages with Nanette to see if they could reestablish visitation, but their efforts proved unsuccessful.  Nichole testified that Ronny had consulted various attorneys in order to try to reestablish contact with the boys, but they "never got anywhere."

At the conclusion of the May hearing Judge Aarseth stated he had more questions for Nanette and Ronny and scheduled another evidentiary hearing for August 4, 2011.

Two days before the continued evidentiary hearing was scheduled to take place, Ronny filed a motion to compel compliance with the visitation order in which he argued that Nanette "has unilaterally abrogated [his] parental rights without cause" by disconnecting her phone and blocking his Skype calls.  Ronny accused Nanette of "using the children as pawns for her own selfish interests"; he further alleged that Nanette had "set[] the stage for the onset of Parental Alienation Syndrome (PAS) to develop in the children's minds."  Nanette denied Ronny's allegations and countered that she had allowed the boys to have unlimited contact with their father rather than follow the rigid court-ordered schedule.  Nanette explained:

> I thought that allowing the boys to have as much contact with their dad as they want was good for the boys.  But when Ronny uses it against me, and tries to make me look bad in court when I am trying to do what's right and what is best for my boys, then I have to reconsider what I am doing.  I am willing to restrict the boys' contact with their dad to what the court ordered, up to 1 hour, twice a week, during the week, and one hour of Skype on the weekend. I am willing to stick strictly and exactly to the court order. Whether that is best for the boys, I don't know.

Nanette argued that Ronny's motion was made in bad faith and requested he pay her attorney's fees incurred in defending against his motion.

Nanette missed the August 4, 2011 evidentiary hearing, so the superior court rescheduled the hearing for later that month. After hearing the parties' closing arguments, the superior court awarded primary physical custody of the children to Nanette and "a form of joint legal custody" to Nanette and Ronny, under which the parties were ordered to communicate and attempt to agree on major decisions affecting the children's welfare, but Nanette would have ultimate decision-making authority should they fail to agree. The court further ordered that: (1) Ronny was awarded telephonic or electronic visitation two days per week during the school week for one hour each day, and one hour on weekends; (2) Ronny could see the children when Nanette visited Florida later that year, should she choose to make them available for a visit; (3) Ronny could have the boys in Florida for two to three weeks during the summer in 2012 and up to six weeks in subsequent summers on the condition that he pay all of their airfare and travel expenses; (4) Ronnie was to file a DR-250 Financial Declaration so that his child support obligation could be determined; (5) Nanette was entitled to claim both boys as dependents on her tax return; (6) Nanette was authorized to use the boys' Alaska Permanent Fund Dividends (PFDs) at her discretion; and (7) Ronny was to be listed as a parent and an emergency contact on the boys' school and other activity contact cards.

The superior court also addressed Ronny's motion to compel compliance with visitation. It found that the motion was made without good faith and described it as a "blow[] below the belt." The court also noted that, but for Ronny's financial situation and inability to work, Ronny would have been ordered to pay Nanette's attorney's fees for the time necessary to respond to his frivolous motion.

On November 17, 2011, the superior court issued a child support order. Ronny appeals both the final custody order and the child support order. Both parties proceed pro se.

## III.    STANDARD OF REVIEW

Whether a superior court has jurisdiction is a question of law that we review de novo.[4]

"The trial court has broad discretion in child custody decisions."[5] We will set aside a superior court's resolution of child custody issues "only if the entire record demonstrates that the controlling findings of fact are clearly erroneous or that the trial court abused its discretion."[6] An abuse of discretion exists where the superior court "considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[7] "A factual finding is clearly erroneous when a review of the record leaves the court with a definite and firm conviction that the superior court has made a mistake."[8] "We give 'particular deference' to the trial court's factual findings when they are based primarily on oral testimony," because it is the function of the trial

---

[4]    *Barlow v. Thompson*, 221 P.3d 998, 1001 (Alaska 2009) (citing *Atkins v. Vigil*, 59 P.3d 255, 256 (Alaska 2002)).

[5]    *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002).

[6]    *Id.*

[7]    *Siekawitch v. Siekawitch*, 956 P.2d 447, 449 (Alaska 1998).

[8]    *Fardig v. Fardig*, 56 P.3d 9, 11 (Alaska 2002) (internal quotation marks omitted).

court, not of this court, to judge the credibility of witnesses and to weigh conflicting evidence.[9]

"Child support awards are reviewed for abuse of discretion and 'will not be set aside unless a review of the record as a whole leaves us with a definite and firm conviction that a mistake has been made.' "[10] Allocation of travel expenses are also reviewed for abuse of discretion.[11]

Additionally, an abuse of discretion exists if the superior court's decision denied a substantial right to or substantially prejudiced a party.[12]

## IV. DISCUSSION

### A. The Superior Court Had Jurisdiction To Hear The Case.

In his appellate reply brief,[13] Ronny argues: "Under the Uniform Child Custody Jurisdiction and Enforcement Act . . . children must reside in a state for six consecutive months before that state can become their legal domicile. Alaska and Florida are signatories to this act. During the initial six month period, the children were under

---

[9]     *Ebertz v. Ebertz*, 113 P.3d 643, 646 (Alaska 2005) (quoting *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001)).

[10]     *Harvey v. Cook*, 172 P.3d 794, 797 (Alaska 2007) (quoting *Moore v. Moore*, 893 P.2d 1268, 1269 (Alaska 1995)).

[11]     *Skinner v. Hagberg*, 183 P.3d 486, 489 (Alaska 2008).

[12]     *House v. House*, 779 P.2d 1204, 1206 (Alaska 1989).

[13]     Although Ronny did not raise this issue in his opening appellate brief, we have consistently held that subject matter jurisdiction "may be raised at any stage of the litigation and if noticed must be raised by the court if not raised by the parties." *Robertson v. Riplett*, 194 P.3d 382, 386 (Alaska 2008) (quoting *Stone v. Stone*, 647 P.2d 582, 584 n.1 (Alaska 1982)).

Florida jurisdiction. This is the reason why [Nanette's] stealthful crossing of state lines was unlawful."

Ronny's assertion appears to be a continuation of the argument he made to the superior court that Alaska lacked jurisdiction over the proceedings. In the superior court Ronny argued that he did not consent to the State of Alaska exercising jurisdiction because "Alaska is an inconvenient forum for him and more importantly, his children were kidnapped by their mother who moved them to Alaska without his knowledge or consent." Ronny also filed a motion to transfer the case to Florida.

> 1. **The superior court had jurisdiction over the child custody proceedings.**

The federal Parental Kidnapping Prevention Act[14] (PKPA) and Alaska's version of the Uniform Child Custody Jurisdiction and Enforcement Act[15] (UCCJEA) govern jurisdiction over child custody proceedings in Alaska when a parent alleges a state other than Alaska has jurisdiction over the children.[16] "These statutes were promulgated in an effort to encourage courts considering child custody matters to cooperate in order to arrive at a fully informed judgment transcending state lines and considering all claimants, residents and nonresidents, on an equal basis and from the standpoint of the welfare of the child."[17] The UCCJEA assigns children "home states"

---

[14]    28 U.S.C. § 1738A (2006).

[15]    Ch. 133, § 2, SLA 1998. Alaska's UCCJEA is codified in title 25, chapter 30 of the Alaska Statutes, AS 25.30.300-25.30.910.

[16]    *Atkins v. Vigil*, 59 P.3d 255, 257 (Alaska 2002) (citing *Rogers v. Rogers*, 907 P.2d 469, 471 (Alaska 1995)). If these statutes conflict, the PKPA preempts the UCCJEA. *Id.* at 258.

[17]    *Id.* (internal quotation marks omitted).

in order to determine which state has principal jurisdiction.[18] "Home state" is defined in part as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months" immediately before the commencement of a child custody proceeding.[19]

The record shows that Nanette and the boys moved to Alaska on May 21, 2009, over 17 months before the child custody proceedings commenced in Alaska. Ronny does not dispute these facts. Thus, Alaska was the children's home state, and the superior court had jurisdiction to make the initial custody determination.

Ronny argues, however, that Alaska lacked jurisdiction because Florida had already assumed jurisdiction over the matter. The PKPA requires a state to recognize and enforce a child custody determination made by a court of another state,[20] and the UCCJEA "severely limit[s]" a state's ability to modify another state's child custody determination.[21] Alaska Statute 25.30.909(3) defines "child custody determination" as "a judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child, including a permanent, temporary, initial, and modification order, except that the term does not include an order relating to child

---

[18]    AS 25.30.300(a).

[19]    AS 25.30.909(7).

[20]    28 U.S.C. § 1738A (2006).

[21]    *S.B. v. State, Dep't. of Health & Soc. Servs., Div. of Family & Youth Servs.*, 61 P.3d 6, 10 (Alaska 2002). "Modification" is defined as "a child custody determination that changes, replaces, supersedes, or is otherwise made after a previous determination concerning the same child, whether or not it is made by the court that made the previous determination." AS 25.30.909(11).

support or other monetary obligation of an individual."[22]

Here, there was no Florida child custody determination that the superior court was required to enforce. The parties submitted three Florida court orders that could arguably be considered Florida child custody determinations: a June 2002 temporary injunction for protection against domestic violence; a September 2002 shelter order; and a June 2003 judicial review order. All three orders were no longer effective or enforceable at the time of the superior court proceedings in Alaska. It is undisputed that the Florida no-contact order and the shelter order expired years ago, and it appears that Florida has not exercised jurisdiction over the parties' child custody or child support matters in any respect since 2004. Thus, there was no Florida "existing, ongoing child custody determination," and the superior court properly assumed jurisdiction.

### 2. The superior court had jurisdiction over the child support matter.

Ronny also asserted throughout the proceedings that the superior court lacked jurisdiction over child support. In his initial answer Ronny argued that a Florida court "reserve[d] juris[d]iction on child support which [Nanette] receives." Ronny additionally filed a motion to transfer the case to Florida, arguing there was a standing child support order in place in Florida.

The Uniform Interstate Family Support Act[23] (UIFSA) and the Full Faith

---

[22]     The PKPA similarly defines the term as "a judgment, decree, or other order of a court providing for the custody of a child" and expressly includes "permanent and temporary orders, and initial orders and modifications" within the statutory definition. 28 U.S.C. § 1738A(b)(3).

[23]     Unif. Interstate Family Support Act § 603(c), 9 U.L.A. 245 (2001) (providing that a state asked to enforce another state's child support order "shall recognize and enforce, but may not modify, a registered order if the issuing tribunal had jurisdiction"). 42 U.S.C. § 666(f) (2006) requires states to adopt the UIFSA. *See also*

and Credit for Child Support Orders Act[24] (FFCCSOA) govern jurisdiction over child support matters and require states to enforce other states' child support judgments in order to create uniformity in interstate judgments.[25] But here, there was no Florida child support judgment that the superior court could have enforced. The 2004 Florida "standing order" to which Ronny refers did not relieve Ronny of his obligation to pay child support; the order expressly stated that Ronny is the boys' natural biological father "and as such owes a duty of support . . . ." However, the order did not set any dollar amount to be paid. Thus, no valid final judgment or child support order existed to which the superior court was obligated to give full faith and credit, and the superior court properly exercised jurisdiction over the child support issues.

### B. Custody Issues

#### 1. The superior court did not abuse its discretion in awarding primary physical custody to Nanette and joint legal custody to Ronny and Nanette.

The superior court must determine custody in accordance with the best interests of the children and must consider the list of statutory factors set forth in AS 25.24.150(c).[26] The superior court "need not make express findings on all statutory

---

[23](...continued)
AS 25.25.101-25.25.903.

[24]    28 U.S.C. § 1738B(a) (2006).

[25]    *Bartlett v. State, Dep't. of Revenue ex rel. Bartlett*, 125 P.3d 328, 330-31 (Alaska 2005).

[26]    AS 25.24.150(c) provides nine factors to be considered in determining the best interests of the child:

> (1) the physical, emotional, mental, religious, and social needs of the child;

(continued...)

factors; instead, its findings 'must either give us a clear indication of the factors which the superior court considered important in exercising its discretion or allow us to glean from the record what considerations were involved.' "[27]

The superior court granted primary physical custody to Nanette and "a form

---

[26](...continued)

(2) the capability and desire of each parent to meet these needs;

(3) the child's preference if the child is of sufficient age and capacity to form a preference;

(4) the love and affection existing between the child and each parent;

(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;

(6) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, except that the court may not consider this willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in domestic violence against the parent or a child, and that a continuing relationship with the other parent will endanger the health or safety of either the parent or the child;

(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;

(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;

(9) other factors that the court considers pertinent.

[27]     *Chesser v. Chesser-Witmer*, 178 P.3d 1154, 1158 (Alaska 2008) (quoting *Smith v. Weekley*, 73 P.3d 1219, 1225 (Alaska 2003)).

of joint legal custody" to Nanette and Ronny after finding that: (1) there was no evidence that the boys had special needs; (2) Nanette had been the primary custodian of the boys and had done "a good job" of meeting their needs; (3) there was love and affection between the boys and both parents; (4) Nanette had provided "a stable home with a positive environment for the boys"; (5) Nanette had gone "above and beyond" in fostering a relationship between the boys and their father, but Ronny had not done the same; (6) there had been a significant history of domestic violence by Ronny against Nanette, but Ronny had overcome the statutory presumption against awarding custody to the perpetrator of domestic violence; and (7) there was no evidence of substance abuse.

Ronny contends that the superior court abused its discretion in awarding primary physical custody to Nanette and a modified form of joint legal custody to Nanette and Ronny. His argument is threefold: (1) it was not in the boys' best interests to move to Alaska with Nanette; (2) the superior court erred in finding that Nanette was more willing and able than Ronny to facilitate and encourage the relationship between the children and the other parent; and (3) it was an abuse of discretion for the superior court to give Nanette ultimate decision-making authority in its award of joint legal custody.

### a. Relocation to Alaska

Ronny argues that Nanette's relocation to Alaska was not in the children's best interests and was instead intended to subvert Ronny's relationship with his children. Ronny argues that the children "were unnecessarily 'uprooted' from a warm and familiar environment to a cold and unfamiliar one." Ronny further contends that Nanette's "relocation to Alaska was by design with the intent to put as much distance as she could between Ronny . . . and his children."

Nanette responds that she "moved to Alaska for a better opportunity for

-17-                                                                                    **6783**

[her] family." Nanette argues that the move made sense financially because her husband was employed on the North Slope and had to fly back and forth between Alaska and Florida every two weeks, and because she could earn more money as a nurse in Alaska. Nanette also argues that she and the boys lived less than two miles from Ronny in Florida but he chose "not to see the boys for 2 years prior to us moving."

We have previously considered the related standards that govern a custody determination when one parent chooses to move out of Alaska.[28] We have held that "a court must consider the best interests of the children by applying the criteria in AS 25.24.150(c), and in doing so should consider whether there is a legitimate reason for the move."[29] "[A] proposed move is legitimate if it 'was not primarily motivated by a desire to make visitation . . . more difficult.' "[30] We have emphasized that the best interests of the child remain paramount, such that child custody determinations "are based upon the facts and circumstances of each particular case."[31] This analysis applies to the circumstances of this case.

Nanette testified that she had a legitimate reason for moving to Alaska: She wanted to live closer to her husband's place of employment, and she was able to secure a higher-paying job for herself in Alaska. Nanette also testified that the move was in the boys' best interests: Their grades have improved since moving to Alaska, they are involved in Boy Scouts, football, basketball, and track, and they live in a nice home with

---

[28]     *Vachon v. Pugliese*, 931 P.2d 371, 379 (Alaska 1996); *McQuade v. McQuade*, 901 P.2d 421, 423 (Alaska 1995).

[29]     *Vachon*, 931 P.2d at 379 (quoting *McQuade*, 901 P.2d at 424) (internal quotation marks omitted).

[30]     *Moeller-Prokosch v. Prokosch*, 27 P.3d 314, 316 (Alaska 2001) (quoting *House v. House*, 779 P.2d 1204, 1208 (Alaska 1989)).

[31]     *McQuade*, 901 P.2d at 424.

a big yard. Nanette's testimony that Ronny voluntarily stopped exercising his visitation rights two years before she and the boys relocated to Alaska also suggests that the move was not primarily motivated by a desire to hinder Ronny's visitation rights.

The superior court did not expressly find that the relocation to Alaska was in the children's best interests, but it credited Nanette's testimony as outlined above in making its custodial best interest findings. These findings are supported by the record and are sufficient to conclude that Nanette's reasons for relocating to Alaska were legitimate and not primarily motivated by a desire to hinder Ronny's visitation with the children.[32]

> **b. The superior court's finding as to each parent's willingness to encourage a relationship with the other parent was not clearly erroneous.**

The superior court must consider "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child" in determining the child's best interests.[33] Here, the court found that this factor "overwhelmingly favors" Nanette. The court explained that "[t]here has been one parent supporting the relationship between the other parent and the children, and that is [Nanette]." The court further found that "[d]espite the fact that she is the victim of

---

[32] Ronny does more than impute an improper motive for Nanette's relocation to Alaska: He alleges that Nanette "kidnapped the minor children for her own selfish interests." On appeal Ronny asserts that (contrary to his testimony) he only found out that Nanette moved to Alaska when he hired an attorney "to serve Nanette Florida court papers" because he thought she and the children were still living in Florida. The issue of kidnapping is not properly on review before this court. Moreover, there was no court order prohibiting Nanette from relocating to another state. Nanette was the custodial parent with legal custody of the children, so she could not have kidnapped the children as a matter of law.

[33] AS 25.24.150(c)(6).

multiple acts of domestic violence from [Ronny], she clearly let that part of her past stay in the past," and "is going above and beyond that required by the court to maintain the relationship between the children and their father."

Ronny argues that the superior court improperly found that AS 25.24.150(c)(6) weighs in Nanette's favor. Ronny's argument is twofold: He argues that Nanette moved to Alaska to subvert his relationship with the boys, discussed above, and that Nanette failed to follow the interim visitation schedule, as alleged in his motion to compel visitation, which was denied by the superior court.

Ronny argues that Nanette violated the interim order and that he was unable to contact his children for a five-week period between the two evidentiary hearings. Ronny argues that Nanette informed the court that she was in the process of obtaining additional phone records to disprove Ronny's accusations, but "these records were never submitted to the court . . . ." According to Ronny, these records "coincide and cover the five week period that [Ronny] had no contact with his children." Ronny further alleges that Nanette disconnected her phone and subsequently failed to attend the evidentiary hearing, such that "[a]ny reasonable person in [Ronny's] position would clearly think that Nanette . . . took off with his children . . . ."

Nanette submitted her home phone records to the superior court and testified that, although she and Ronny were no longer adhering to the rigid interim visitation schedule between May and August 2011, she was allowing the boys to have frequent and unlimited contact with Ronny via Xbox Live and Skype. Nanette explained that the boys enjoyed having open communication with their father, and she gave them total freedom with the phone because "that is what the boys are wanting, they want to have a relationship with their dad." Nanette stated that the children often called their father on his home phone number, records which Ronny did not submit. Nanette testified that she was unable to obtain a month's worth of records for her old cellular

phone, but she submitted records for her new cellular phone to show that she had texted her new number to Ronny. Nanette further testified that there was a period for which she did not have records because Ronny and the boys were talking via Xbox Live and Skype, and she could not obtain records for these methods of communication. With regard to the missed evidentiary hearing, Nanette testified that she did not appear because she "had November second in her head," and apologized for her mistake.

The superior court found unpersuasive Ronny's allegations that Nanette was trying to alienate the children and "accept[ed] [Nanette's] testimony regarding her efforts to maintain the connection between the children and their father." The superior court's findings were not based on phone records that Nanette stated she would submit in the future, but rather on Nanette's testimony, which the superior court found credible, and on the admitted exhibits. The court's finding that Ronny's motion lacked a good faith basis is also supported by the record and further supports its finding that Nanette was more willing than Ronny to foster the relationship between the other parent and the children. As discussed above, the court's findings regarding Nanette's relocation were not clearly erroneous, and Nanette's relocation does not establish her present unwillingness to facilitate and encourage Ronny's relationship with his children. Thus, the superior court's finding that Nanette was more willing than Ronny to facilitate and encourage a close and continuing relationship between the children and the other parent is supported by ample evidence and was not clearly erroneous.

### c. It was not an abuse of discretion to order a modified form of joint legal custody.

Ronny argues that the superior court abused its discretion by awarding the parties a modified form of joint legal custody, under which they must communicate with each other and attempt to agree on major decisions affecting the boys' welfare, but Nanette is given final decision-making authority should they fail to agree. Ronny further

argues that because the visitation schedule may be modified in writing by the parties, Nanette "will always have the last say concerning modifying visitation."

An award of joint legal custody means that the parents share responsibility in the making of major decisions affecting the children's welfare.[34] These major decisions include choices regarding the children's education, non-emergency health care, morals, and religion.[35] "The legislature has expressed a preference for joint legal custody, and a court may award joint custody if it is in the best interests of the child."[36] However, "joint legal custody is only appropriate when the parents can cooperate and communicate in the child's best interest."[37]

The superior court found that the case had generally moved in a positive direction and that Ronny and Nanette had "made enormous strides in terms of where they are in relationship to each other as parents." But it also expressed concern over Ronny's desire to adhere to a rigid visitation schedule rather than accept a more flexible approach, and it found that Ronny had made unfounded and frivolous allegations against Nanette. These findings are supported by the record and show that, while Ronny and Nanette's relationship has improved, Ronny has at times failed to take reasonable steps to communicate and cooperate with Nanette.

The superior court has broad discretion in making a legal custody

---

[34] *Farrell v. Farrell*, 819 P.2d 896, 899 (Alaska 1991) (quoting *Bell v. Bell*, 794 P.2d 97, 99 (Alaska 1990)).

[35] *Elton H. v. Naomi R.*, 119 P.3d 969, 975 (Alaska 2005) (citing 3 ARNOLD H. RUTKIN, FAMILY LAW AND PRACTICE § 32.08[2] (2004)).

[36] *Jaymot v. Skillings-Donat*, 216 P.3d 534, 540 (Alaska 2009).

[37] *Farrell*, 819 P.2d at 899.

determination.[38] It is a permissible exercise of that discretion to order the kind of modified shared legal custody the court ordered here. We commend the court for trying to involve both parents in major decisions affecting the children's welfare, even where the parties have some difficulty communicating with one another. The court's approach is reasonably intended to encourage both parents to communicate and attempt to make decisions about their children, but it also practically recognizes that if they cannot make a decision, then one of them must be given that responsibility and authority. The superior court did not abuse its discretion by ordering this modified form of joint legal custody.

Ronny is incorrect that the custody order gives Nanette the right to unilaterally modify visitation. The custody order gives Nanette ultimate authority with regard to major decisions affecting the children's welfare, but it does not give her the authority to abrogate the court's custody order or to change the terms of Ronny's visitation. Nanette is required to allow Ronny his court-ordered visitation, and if Ronny feels that Nanette is denying him his visitation rights, he is free to file a motion with the superior court.

## C. Child Support Issues

### 1. The superior court did not abuse its discretion by ordering Ronny to pay child support.

Ronny argues that the superior court should not have awarded child support to Nanette. Ronny contends that he is not "attempting to skirt his child support obligation," but "[h]e simply doesn't have the dollars" and the boys do not need his support. Ronny further argues that he "has made a proper showing for a good cause

---

[38]  *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002).

variance to the child support requirements as listed in Alaska Rule of Civil Procedure 90.3."

Alaska Civil Rule 90.3 states that where one parent is awarded primary physical custody, a child support award will be calculated "as an amount equal to the adjusted annual income of the non-custodial parent multiplied by a percentage specified in sub-paragraph (a)(2)."[39] Civil Rule 90.3(c)(1) also provides that "[t]he court may vary the child support award as calculated under the other provisions of this rule for good cause upon proof by clear and convincing evidence that manifest injustice would result if the support award were not varied." What constitutes "good cause" will depend on the circumstances of each case,[40] with emphasis on the needs of the children.[41] The statute lists examples of exceptional circumstances that might amount to good cause, but this list is not exhaustive.[42]

As the parent who has been awarded primary physical custody, Nanette is entitled to child support from Ronny, the non-custodial parent.[43] Both parties submitted updated Child Support Guidelines Affidavits, as required by Civil Rule 90.3. Nanette reported an adjusted annual income of $26,870 on her affidavit. Ronny reported an adjusted annual income of $9,444 on his affidavit. The superior court correctly applied

---

[39]     Alaska R. Civ. P. 90.3(a). Rule 90.3(a)(2) provides that for two children, the non-custodial parent's adjusted income must be multiplied by 27% in order to calculate the child support award.

[40]     Alaska R. Civ. P. 90.3 cmt. VI.A.

[41]     *Doyle v. Doyle*, 815 P.2d 366, 373 (Alaska 1991).

[42]     *See* Alaska R. Civ. P. 90.3(c)(1).

[43]     Alaska R. Civ. P. 90.3(a); *see Matthews v. Matthews*, 739 P.2d 1298, 1299 (Alaska 1987) ("A parent is obligated both by statute and at common law to support his or her children.").

the formula provided by Rule 90.3 to calculate that Ronny owes Nanette $215 per month to support their two children.

Ronny did not argue to the superior court that he was entitled to a Civil Rule 90.3(c)(1) good cause exception; thus, this argument is waived.[44] Moreover, Ronny did not present any evidence that would warrant a good cause finding. Ronny repeatedly argued to the superior court that he was indigent and disabled, but Civil Rule 90.3 expressly defines "income" to include social security and disability benefits.[45] And Civil Rule 90.3 already takes into account Ronny's low income in its calculation of child support payments. The fact that Nanette earns more money than Ronny does not amount to the type of "manifest injustice" required for a good cause finding.

### 2. The superior court did not abuse its discretion in declining to impute income to Nanette.

Ronny argues that the superior court should have imputed income to Nanette because, as a nurse, Nanette should be working more than six days a month. Ronny argues that Nanette is voluntarily underemployed, whereas he cannot work because he is disabled. Ronny asserts that if Nanette was "gainfully employed at the standard 40 hour work week, her adjusted annual income would be significantly higher than $26,870.16; instead she has forever quashed her nursing career in the pursuit of extracting child support dollars from the disabled and the disadvantaged."

As discussed above, where one party is awarded primary physical custody, Alaska Civil Rule 90.3(a) requires the superior court to base its child support order exclusively on the non-custodial parent's income. In such circumstances, the statute does not contemplate that the custodial parent's income will factor into the court's

---

[44] *See Harvey v. Cook*, 172 P.3d 794, 802 (Alaska 2007) ("[I]ssues not properly raised in the trial court will not ordinarily be considered on appeal.").

[45] Alaska R. Civ. P. 90.3 cmt. III.A.

calculation. It is true that Alaska Civil Rule 90.3(a)(4) gives the superior court the discretion to "calculate child support based on a determination of the potential income of a parent who voluntarily and unreasonably is unemployed or underemployed," but this provision does not apply where the obligee is awarded primary physical custody.[46]

Here, because Nanette was awarded primary physical custody, the superior court could not permissibly impute potential income to her pursuant to Alaska Civil Rule 90.3(a)(4). Thus, Nanette's employment situation was irrelevant and properly did not factor into the superior court's child support award.

### 3. It was an abuse of discretion to order Ronny to pay 100% of the children's visitation expenses.

Ronny argues that the superior court erred when it ordered him to pay for the boys' visitation expenses. Ronny argues that, although the custody order grants him yearly visitation with his sons in Florida, he will never see them unless they travel to Florida with their mother because "he can't afford their round trip air fare to Florida." Ronny asserts that it would cost him $2,200 to fly his boys to Florida for two weeks, and the court "knew ahead of time that Ronny . . . could not afford 'in person' visitation."

The superior court noted that Nanette and the boys were planning to travel to Florida the following summer and left it to Nanette's discretion to allow Ronny to see the boys during their trip. With regard to in-person visitation in subsequent years, the superior court ordered that Ronny be allowed to have the boys for two to three weeks during the summer of 2012 and up to six weeks in the summer of 2013 if the other trips went well. But the superior court conditioned Ronny's in-person visitation on his payment of one-hundred percent of airfare and other travel expenses, stating:

---

[46] The superior court may consider the custodial parent's income where a good cause variance is warranted. Alaska R. Civ. P. 90.3 cmt. VI. As discussed above, Ronny is not entitled to a good cause variance.

I'm just not going to put [Nanette] in a position where it's her job to finance the visitation. That's not appropriate under the circumstances. First of all, she's not making that much money. Secondly, she's not getting much in terms of child support, so it's not as if that money exists to really do that. . . . I'd like to see if [Ronny] can foot the bill to be able to have the boys for a couple weeks in the summertime.

Alaska Civil Rule 90.3(g) provides: "After determining an award of child support under this rule, the court shall allocate reasonable travel expenses which are necessary to exercise visitation between the parties as may be just and proper for them to contribute."

It does not appear that the superior court considered the mandate of Alaska Civil Rule 90.3(g) to allocate reasonable visitation expenses. The superior court implicitly found that it was in the children's best interests to visit Ronny by awarding him two to three weeks of visitation in 2012 and up to six weeks in 2013, and Nanette agreed that the boys benefitted from increased contact with their father. But the record before the superior court clearly indicates that an order granting Ronny in-person visitation rights would potentially be rendered meaningless if Ronny were required to pay all the visitation expenses. The record shows that Ronny has an adjusted annual income of $9,444, twenty-seven percent of which was awarded to Nanette as child support. After payment of child support, Ronny's adjusted annual income will be approximately $6,894. The record also shows that Nanette earns significantly more money than Ronny, and that she has the potential to earn additional income.[47] Nanette also has access to the boys' PFDs, to be used at her discretion. Given these facts, it was

---

[47] Although Alaska Civil Rule 90.3(a) precludes the superior court from considering the obligee's income in awarding child support where one parent is awarded primary physical custody, nothing in the rule prohibits a court from considering potential income in allocating visitation expenses.

neither "reasonable" nor "just and proper" for the superior court to require Ronny to pay for all the visitation expenses, and it was an abuse of discretion to condition his visitation on his ability to pay.

We reverse the visitation expense order and remand for the court to reconsider what constitutes a reasonable, just, and proper allocation of visitation expenses. On remand the superior court may, in its discretion, take additional evidence regarding the parties' finances. And as we discuss next, the court may require Nanette to use some or all of the boys' PFDs to contribute toward visitation expenses.

**4.    The superior court did not abuse its discretion by authorizing Nanette to use the boys' PFDs as needed.**

As part of its final custody order, the superior court authorized Nanette "to apply for and receive the boys' Alaska Permanent Fund Dividends, and to use them as needed, in her discretion, because she is receiving so little child support." Ronny asserts that, rather than giving Nanette discretion to use the boys' PFDs, "the trial court could have ordered that 50% of those annual dividends would be used for airfare to Florida toward the children's summer visitation with their father with the remainder of the airfare to be paid by Ronny . . . ." Ronny asserts that this "type of a visitation order would be affordable and within [his] reach."

Alaska Statute 43.23.005(c) authorizes a parent to claim a PFD on behalf of an unemancipated minor, but the law is silent as to a parent's responsibilities once those funds are distributed.[48] We have previously recognized the superior court's broad discretion to decide which parent would better serve the children's best interests in being responsible for management of their PFDs.[49] The superior court did not abuse its

---

[48]    *Hayes v. Hayes*, 922 P.2d 896, 900-01 (Alaska 1996).

[49]    *Helen S.K. v. Samuel M.K.*, 288 P.3d 463, 477 (Alaska 2012).

discretion in declining to order Nanette to use their PFDs in a particular manner.  On remand, however, the superior court may in its discretion order the boys' PFDs to be applied in whole or in part to their travel expenses.

> **D.  The Superior Court Did Not Abuse Its Discretion In Declining To Admit The Tape Recording Of Ronny's Conversation With Nanette's Father.**

During the evidentiary hearing Ronny attempted to enter into evidence a tape recording of a telephone conversation he had with Nanette's father, Donald, that was made without Donald's knowledge.  The superior court declined to play the tape, stating that it had no way of doing so, and instead found that the appropriate approach was to call Donald to testify live.  Ronny did not object, and both Nanette and Ronny were given the opportunity to examine Donald.

On appeal Ronny argues that the superior court had a duty to play the tape.[50]  Ronny argues that "[h]ad the tape been played, [Donald] may have recalled some things he said that were not recorded."  Ronny contends that the recording would show that Ronny "was solely concerned about the welfare of his boys and that [Nanette] may be intentionally alienating the boys from him."  Ronny further argues that "[h]ad the tape been admitted, the outcome of Judge Aarseth's ruling could have been different . . . ."

In his offer of proof to the superior court, Ronny stated that the tape recording was important to his case in several ways.  Ronny argued that the tape would show Nanette never intended for him to have her address or to regain contact with the children and that Nanette's allegations of domestic violence were false.  Ronny also claimed that Donald stated that Nanette did not want Ronny to have her address, and that

---

[50]     Ronny argues numerous grounds as to why the tape recording was legal even though it was made without Donald's permission.  The superior court never found that the tape was illegally recorded; it declined to play the tape without making any findings as to its admissibility.

Donald acknowledged that he did not condone Nanette's behavior.

Nanette admitted that she did not want Ronny to have her physical address because of the history of domestic violence, so the tape was not necessary to show that Nanette instructed Donald not to give Ronny her address. Also, Ronny was convicted of domestic violence and is thus collaterally estopped from relitigating these convictions,[51] so the tape could not be used to show that Ronny did not commit domestic violence against Nanette. The tape could therefore only be used, if at all, to show that Donald had previously stated that he did not condone Nanette's behavior and to potentially impeach Donald.

Alaska Rule of Evidence 801(d)(1) allows prior statements of a witness to be admitted if the declarant testifies at the hearing and the statement is inconsistent with the declarant's testimony. " 'Inconsistency' does not necessarily require textual conflict; other circumstances, including lack of memory at trial, may suffice."[52]

Theoretically, Donald's statement on the recording was potentially admissible as a prior inconsistent statement. The superior court did not make any evidentiary findings in declining to play the tape, and the record only indicates that the superior court declined to play the recording because it was unable to do so. It is unclear whether this indicates a logistical or technical inability, or some other inability. Assuming without deciding that it was error not to admit the tape, Alaska Civil Rule 61 provides that errors in the admission or exclusion of evidence are to be judged under the

---

[51]     *See Lamb v. Anderson*, 147 P.3d 736, 742 (Alaska 2006) (holding that "a conviction based on a no contest plea will collaterally estop the criminal defendant from denying any element in a subsequent civil action against him that was necessarily established by the conviction, as long as the prior conviction was for a serious criminal offense and the defendant in fact had the opportunity for a full and fair hearing").

[52]     *Vaska v. State*, 135 P.3d 1011, 1015 (Alaska 2006).

harmless error rule: "A party appealing the exclusion of evidence must show not only that such exclusion was improper, but also that it resulted in prejudice to that party."[53] Here, Ronny has not shown that he was in any way prejudiced by the exclusion of the tape recording. Ronny's offer of proof indicated that the tape was only relevant to impeach Donald's statement that Nanette did the right thing by moving to Alaska. But the court's findings did not rely on Donald's opinion regarding Nanette's move, and it is highly improbable that Donald's opinion would even be a relevant factor for the court to consider on this issue. Ronny was not prejudiced by his inability to impeach Donald.

E.    **The Superior Court Exhibited No Bias Against Ronny.**

Ronny alleges that the superior court displayed "a pervasive pattern of prejudice" against him. Ronny points to the allocation of visitation expenses, the award of child support, the superior court's failure to sanction Nanette for missing the evidentiary hearing, and the superior court's denial of Ronny's motion to compel visitation as "prime examples of how Judge Aarseth sided with Nanette . . . in a compassionate manner but much to the detriment of Ronny . . . ." Ronny also takes issue with some of the language used by the superior court. Specifically, Ronny argues that the superior court should not have praised Nanette for going "above and beyond" in allowing Ronny telephonic visitation while simultaneously telling Ronny "he better start showing some appreciation for what [Nanette] is doing." Ronny argues: "Apparently, the Trial Court has one standard for [Nanette] and another standard for Ronny . . . . This is called impropriety . . . . Judge Aarseth has repeatedly shown favoritism to [Nanette] while treating Ronny . . . as an outcast[]."

"To prove a claim of judicial bias, the claimant must show that the judge formed an opinion of [him] from extrajudicial sources, resulting in an opinion other than

---

[53]    *Estate of Arrowwood v. State*, 894 P.2d 642, 648 (Alaska 1995).

on the merits."[54] No bias is shown if a judge derives an opinion based on the record, and the opinion is supported by the record.[55] We have also held that a court's ruling adversely against a party does not establish evidence of bias.[56]

Ronny has not made a showing of judicial bias. As discussed above, the superior court's findings and rulings are supported by the record.[57]

## V.    CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's child custody order. We REVERSE and REMAND the court's visitation expense order, but AFFIRM the superior court's child support order in all other respects. We AFFIRM the remainder of the superior court's rulings.

---

[54]    *Williams v. Williams*, 252 P.3d 998, 1010 (Alaska 2011).

[55]    *Id.*; *Peterson v. Ek*, 93 P.3d 458, 467 (Alaska 2004).

[56]    *Labrenz v. Burnett*, 218 P.3d 993, 1002 (Alaska 2009) (citing *Tillmon v. Tillmon*, 189 P.3d 1022, 1027 n.13 (Alaska 2008)).

[57]    Ronny alleges that Nanette is currently in violation of the final custody order. If Ronny believes Nanette has interfered with his telephonic visitation rights, he may file a motion to enforce the final custody order with the superior court.