*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TRAVIS M. JUDD, | ) | |
| | ) | Supreme Court No. S-16213 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-13-01989 CI |
| v. | ) | |
| | ) | O P I N I O N |
| AMANDA BURNS f/k/a JUDD, | ) | |
| | ) | No. 7184 – July 7, 2017 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael P. McConahy, Judge.

Appearances: Mila A. Neubert, Neubert Law Office, LLC, Fairbanks, for Appellant. Margaret O'Toole Rogers, Foster & Rogers, LLC, Fairbanks, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

MAASSEN, Justice.

## I.    INTRODUCTION

Divorced parents shared custody of their son equally pursuant to a parenting agreement. The mother asked the superior court to modify the agreement to allow her to move with the child to Hawaii. Following a two-hour hearing the court modified custody, granting primary physical custody to the mother; it also modified legal custody to allow the mother final decision-making authority, subject to later court

ratification, though neither party had asked that legal custody be modified. The father appeals.

We conclude that the superior court did not clearly err or abuse its discretion when it granted modification and awarded primary physical custody to the mother, and we affirm that part of the court's decision. But we hold that it was an abuse of discretion to modify legal custody when neither party had requested it, the parties were not on notice that it was at issue, and the evidence did not demonstrate a need for it. We therefore vacate the modification of legal custody.

## II. FACTS AND PROCEEDINGS

### A. The Parenting Agreement

Travis Judd and Amanda Burns were married in 2008 and have a son, H., who was born in 2011. Amanda also has another son, K., from a prior marriage.[1] The couple separated in May 2013. Amanda received a default divorce, but when Travis appeared with new counsel the court set the default aside in August 2014 and scheduled a custody trial for the following year.

In the meantime the court left in place the custody order entered after default, granting Amanda sole legal and primary physical custody, with reasonable visitation for Travis. The court also referred the case to a child custody investigator for early evaluation, possible settlement discussions, and an investigation if the parties could not settle.

In October 2014 Travis moved for temporary orders granting joint legal and shared physical custody. In February 2015, as the scheduled hearing on the motion was about to begin, the parties stipulated to temporary orders by which they shared legal

---

[1] We identify the children by their initials in order to better protect their privacy.

custody, Amanda had primary physical custody, and Travis had regular daytime visitation. They agreed that Travis's visitation would increase to include overnights once he obtained a substance abuse assessment and complied with any resulting recommendations.

Through mediation, the parents were then able to reach a permanent parenting agreement before trial. They agreed to joint legal custody and that they would gradually transition to shared physical custody as Travis satisfied certain conditions, including moving from his dry cabin to more conventional housing, undergoing an anger management assessment, and completing any recommended treatment. Travis and Amanda would ultimately share physical custody 50-50 once the conditions were satisfied.

By August 2015 Travis had obtained conventional housing, had completed the assessment, and had attended recommended classes. The parties began sharing custody equally a month later.

## B.    Amanda's Motion To Modify Custody

In September 2015 — shortly after the parties began sharing custody equally — Amanda filed a motion to modify the custody agreement to award her primary physical custody. She explained that she planned to move to Hawaii before the start of the 2016 school year with her new husband and K., her older son, and she wanted H. to move with them.[2] She asserted that the move would provide "opportunities for a larger income, increased family stability, and a better environment" as well as "open doors for" the two boys. She wanted H. to live with her in Hawaii during the school year and have "liberal summer and holiday visitation" with Travis in Fairbanks.

---

[2]    The parties agree that Amanda's possible move to Hawaii was at least mentioned during the mediation that resulted in the parenting agreement, though the consequences of the move were not formally addressed or resolved at that time.

Travis opposed the modification, arguing that the move was intended to avoid sharing custody and was not in H.'s best interests. He pointed to Amanda's history with K. and contended that he and Amanda "actually got married when they did . . . because Amanda believed that being married and planning to move out of state (at that time, Texas) would make it easier for her to obtain primary physical custody of [K.]." According to Travis, Amanda's history with K.'s father demonstrated the unlikelihood that she would help maintain a strong long-distance relationship between Travis and H. Travis also requested appointment of another custody investigator, a request the court denied.

The court found that Amanda's allegations justified an evidentiary hearing and scheduled a two-hour hearing to decide two relevant issues: whether Amanda's proposed move was legitimate and whether moving to Hawaii with Amanda was in H.'s best interests.[3] Following the hearing, the court agreed with Amanda's position on both issues. It granted the requested modification, awarding Amanda primary physical custody and Travis summer and holiday visitation. The court also modified legal custody, granting Amanda final say on legal custody issues but requiring her to seek the court's approval within ten days of a disputed decision.

Travis appeals, raising these issues: (1) whether the superior court clearly erred in finding that Amanda's planned move was legitimate; (2) whether the court abused its discretion when it failed to order a custody investigation; (3) whether the court abused its discretion by limiting the evidentiary hearing to two hours; (4) whether the court abused its discretion when it decided that it was in H.'s best interests to move to Hawaii with Amanda; and (5) whether the court abused its discretion by modifying legal custody.

---

[3]     *See Rego v. Rego*, 259 P.3d 447, 453 (Alaska 2011).

## III. STANDARDS OF REVIEW

"Superior courts have broad discretion in child custody decisions, and we will reverse only if findings of fact are clearly erroneous or if the superior court abused its discretion."[4] "A factual finding is clearly erroneous when a review of the record leaves the court with a definite and firm conviction that the superior court has made a mistake."[5] "An abuse of discretion exists where the superior court 'considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others.' "[6] "Additionally, an abuse of discretion exists if the superior court's decision denied a substantial right to or substantially prejudiced a party."[7] We apply "the abuse of discretion standard to review a trial court's decisions relating to appointment of a child custody investigator."[8]

## IV. DISCUSSION

"Alaska Statute 25.20.110 authorizes courts to modify child-custody and visitation awards if (1) there has been a change in circumstances that justifies modification and (2) the modification is in the best interests of the child."[9] "We have

---

[4]    *Riggs v. Coonradt*, 335 P.3d 1103, 1106 (Alaska 2014) (citing *Ronny M. v. Nanette H.*, 303 P.3d 392, 399 (Alaska 2013)).

[5]    *Id.* (quoting *Ronny M.*, 303 P.3d at 399).

[6]    *Id.* (quoting *Ronny M.*, 303 P.3d at 399).

[7]    *Ronny M.*, 303 P.3d at 400 (citing *House v. House*, 779 P.2d 1204, 1206 (Alaska 1989)).

[8]    *Littleton v. Banks*, 192 P.3d 154, 157 (Alaska 2008) (quoting *Ogden v. Ogden*, 39 P.3d 513, 516 n.2 (Alaska 2001)).

[9]    *Rego v. Rego*, 259 P.3d 447, 452 (Alaska 2011) (citing *Melendrez v.*
(continued...)

held that a custodial parent's decision to move out-of-state . . . amounts to a [substantial] change in circumstances as a matter of law" for purposes of physical custody modifications.[10] Accordingly, both parties in this case agree that Amanda's proposed move constitutes a change in circumstances that may justify a modification of physical custody.

When deciding whether to modify custody because of a parent's planned move, the superior court must determine "whether there are legitimate reasons for the move."[11] If the move is legitimate, "there is no presumption favoring either parent when the court considers the child's best interests."[12] "The relocating parent secures primary custody by showing that living with that parent in a new environment better serves the child's interests than living with the other parent in the current location."[13] "The ultimate focus of the custody modification statute is the best interests of the children."[14]

---

[9] (...continued)
*Melendrez*, 143 P.3d 957, 962 (Alaska 2006)).

[10] *Id.* (alterations in original) (quoting *Barrett v. Alguire*, 35 P.3d 1, 6 (Alaska 2001)).

[11] *Id.* at 453 (citing *Barrett*, 35 P.3d at 6).

[12] *Id.* (citing *McQuade v. McQuade*, 901 P.2d 421, 424 (Alaska 1995)).

[13] *Id.*

[14] *Lashbrook v. Lashbrook*, 957 P.2d 326, 328-29 (Alaska 1998).

**A.    The Superior Court Did Not Clearly Err When It Found That Amanda's Move Was Legitimate.**

"A move is legitimate if it is not primarily motivated by a desire to make visitation more difficult."[15]  Here, the superior court recognized "[t]he reality [that] any move by a parent from a common community" will make the other parent's visits more difficult, but it found persuasive the testimony of Amanda and her husband that making visitation more difficult for Travis was not their intent.  The court found it "more probable than not that the move is based on considerations of financial security and opportunities for growth."

Travis argues that this finding was erroneous because "Amanda's stated reasons for the move changed over time," which should have prompted more judicial skepticism.  He argues that Amanda first cited "economic reasons" for the move before testifying that the main reason was the boys' education.  But Amanda's explanations were not so inconsistent that the superior court could not find them credible.  In her request to modify custody she cited Hawaii's "opportunities for a larger income, increased family stability, and a better environment."  She reiterated these themes at the hearing, and her new husband testified about his own job opportunities in Hawaii.  The evidence sufficiently supports the court's finding that the move was primarily motivated by financial security and opportunities for job growth.

Travis counters that both Amanda and her husband had decent employment in Fairbanks and were unlikely to make more money in Hawaii, and he challenges as "offensive and disingenuous" Amanda's argument that she needs increased job security.  But Amanda testified that she makes less money every year in her Fairbanks job, that she is afraid for the continued security of her employment there, and that  Hawaii holds more

---

[15]    *Rego*, 259 P.3d at 453 (citing *Moeller-Prokosch v. Prokosch*, 27 P.3d 314, 316 (Alaska 2001)).

opportunities for her. Her husband testified about his dim view of Alaska's economy and that the economy in "Hawaii, especially Kona, the Big Island, is absolutely on fire." Regardless of these witnesses' abilities as economic forecasters, their testimony supports the superior court's findings about their subjective rationales.[16]

Travis argues that the superior court failed to give adequate weight to the "purely voluntary" nature of the move — which he characterizes as a "move to a warmer climate, by choice." He contends that "simply moving . . . [to] be more happy and enjoy better weather year-round does not make the move a legitimate one." While vague and aesthetic motives may be less convincing than more easily explained ones, moving to be "more happy" or to "enjoy better weather year-round" may be sufficient; indeed, the superior court does not need to be able to identify the primary motivation at all as long as it can exclude "a desire to make visitation more difficult," as the court did here.[17]

Finally, Travis asserts that Amanda "has a pattern of moving to avoid sharing physical custody of her children" which the superior court "disregarded entirely." But the superior court considered and rejected Travis's argument. The court acknowledged the relevance of Amanda's earlier move to Alaska with K., her older son, and its impact on K's relationship with his father in Texas. But the court "d[id] not

---

[16] The question for the court is what motivated the move, not whether the motivation was a wise one. *See Beals v. Beals*, No. S-15632, 2015 WL 1394674, at *3 (Alaska Mar. 25, 2015) (affirming finding of legitimacy where the superior court found that "[a]lthough [the mother's] decision to leave her long-standing job in Seward was short-sighted, it was not motivated to interfere with [the father's] relationship with the children").

[17] *Rego*, 259 P.3d at 453 (citing *Moeller-Prokosch v. Prokosch*, 27 P.3d 314, 316 (Alaska 2001)); *see also Silvan v. Alcina*, 105 P.3d 117, 121 (Alaska 2005) (explaining that "[t]he superior court correctly applied our holdings" when it found "a legitimate reason to move" based on the parent's "desire to get away from the State of Alaska.").

agree" with Travis that K.'s move from Texas to Alaska "presages a similar fate for [H.] if [Amanda] goes to Hawaii." Travis's allegations notwithstanding, the superior court expressly found that the evidence did not show that K. and his father lacked an "open, loving" relationship after Amanda and K. moved to Alaska. And there is support in the record for the court's refusal to find that this history intimated trouble for Travis. Though Travis testified that Amanda told him she wanted to marry him and move to Alaska in part to make it easier to get custody of K., Amanda denied it, and the superior court could credit her denial. The court had earlier noted Amanda's efforts to "make sure that [H.] has access to his father" in the months following the default, even though the orders then in place did not require it. While we agree that the court could have made different inferences from Amanda's history with K. and K.'s father, its finding of motivation depends almost entirely on its credibility assessments, "and we therefore give it particular deference."[18] We conclude that the superior court did not clearly err when it found that Amanda's planned move to Hawaii was legitimate.[19]

## B. The Superior Court Did Not Abuse Its Discretion When It Declined To Order A Custody Investigation.

The superior court had referred the case to a custody investigator in its first scheduling order after setting aside the default, but the parties then reached their

---

[18] *Kristina B. v. Edward B.*, 329 P.3d 202, 214 (Alaska 2014) (citing *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014)).

[19] Travis also argues that Amanda's move was illegitimate because "Amanda and her husband had never lived in Hawaii previously." While existing connections will likely strengthen a parent's case that the move is legitimate, they are not required; for example, a parent may move to a new place because of its educational or employment opportunities. *See House v. House*, 779 P.2d 1204, 1208 (Alaska 1989) (upholding legitimacy for a "move to Berkeley so that his wife could pursue her Ph.D."), *superseded by statute on other grounds as recognized in Collier v. Harris*, 377 P.3d 15, 25 (Alaska 2016).

parenting agreement at mediation, ostensibly resolving all issues of custody without the investigator's input. There is no indication in the record that the initial referral resulted in any written evaluation or investigation. Travis requested a custody investigation again in response to Amanda's request for modification; he argues that the superior court abused its discretion when it declined to appoint an investigator at that stage of the proceedings.[20] We disagree.

Alaska Civil Rule 90.6 provides that the court "may appoint an expert" to investigate custody issues and "provide an independent opinion concerning the child's best interests." Because the purpose of the investigation is to assist the court, the court has "wide discretion" to decide whether an appointment should be made.[21] "Unless it can be shown that a court would be unable to determine the child's best interest without a custody investigation, a trial court does not abuse its discretion when it decides not to appoint an investigator."[22]

---

[20] Travis made his request for a custody investigation in his opposition to Amanda's motion to modify custody. Amanda argues that he then waived the argument when he failed to raise it again before the modification hearing, after the court informed the parties that no custody investigator would be appointed. But Travis did not have to repeat his request after its denial in order to preserve the issue for appeal. *See Pierce v. Catalina Yachts, Inc.*, 2 P.3d 618, 620 n.2 (Alaska 2000) (noting that "a party has no duty to take exception when the trial court rules on a disputed issue" in order to adequately preserve the right to argue the point on appeal).

[21] *D.D. v. L.A.H.*, 27 P.3d 757, 761 (Alaska 2001) (citing *Pearson v. Pearson*, 5 P.3d 239, 242 (Alaska 2000)); *see also Yelena R. v. George R.*, 326 P.3d 989, 1001 (Alaska 2014) (concluding that the superior court did not abuse its discretion when it decided not to appoint a custody investigator in response to a parent's oral request because the "custody office was busy and it was likely no one would be able to meet with them until the fall").

[22] *D.D.*, 27 P.3d at 761.

Travis asserts that the superior court was aware of possible substance abuse and domestic violence issues of the kind that often "lead trial courts to appoint a custody investigator." He also argues that the court had only "between four [and] five hours of experience with the parties total over a span of two and a half years" and had "never held a best interests hearing regarding [H.]" before the modification hearing. But Travis does not persuade us that issues of substance abuse and domestic violence made an investigation necessary rather than merely helpful. The superior court believed it was familiar enough with Amanda, Travis, and H. that an independent investigation would not significantly aid its consideration of the issues on modification, a conclusion it was in the best position to reach.[23] And as explained in the section that follows, we agree that the court was able to reach a reasoned decision on H.'s best interests. We conclude that the superior court's refusal to order a custody investigation was not an abuse of discretion.

## C.     The Superior Court Did Not Abuse Its Discretion When It Granted Amanda Primary Physical Custody.

Travis argues that the superior court abused its discretion when it modified physical custody because (1) the evidentiary hearing was too short and (2) the court failed to appropriately weigh the best interests factors. We conclude that there was no abuse of discretion.

### 1.     Length of hearing

Travis contends that the "distressingly short" evidentiary hearing on modification was insufficient to allow the court to make an informed best interests

---

[23]     For this reason we are also unpersuaded by Travis's argument that the parties' mutual assent to an investigation required the court to order one.

determination. He does not frame his argument in due process terms,[24] so we consider only whether the superior court abused its discretion when it limited the hearing to two hours.

Travis first argues that the superior court was able to gather so little information that any decision it made must have been arbitrary; he argues that a two-hour hearing was "so little, and so less than typically provided for matters of this weight, that it leads one to conclude that the trial court had already made up its mind to rule in Amanda's favor prior to the hearing." He contends that the hearing's brevity "did not permit [him] to have any experts testify on his behalf." Amanda admits that "no formal best interest hearings had been held" previously in the case, but she asserts that the superior court "had over two years of pleadings, testimony regarding the parties' concerns, and the Superior Court's own impressions over that time."

We conclude that the record supports the superior court's determination that it had the evidence it needed to make a reasoned best interests decision. We note first that the court's on-record comments earlier in the case demonstrate its familiarity with the issues in at least a general sense. The parties then submitted extensive competing affidavits that the court had to review in deciding whether to grant a hearing on Amanda's motion to modify custody. With this background, the court began the December 2015 hearing by informing the parties that "if I find that it is a legitimate

---

[24]     We have explained that "[i]t is essential to contested custody proceedings that the parties be afforded a hearing which grants them the opportunity to present the quantum of evidence needed to make an informed and principled determination." *Lashbrook v. Lashbrook*, 957 P.2d 326, 328 (Alaska 1998) (citations omitted). Relatedly, a court abuses its discretion where "the superior court's decision denied a substantial right to or substantially prejudiced a party." *Ronny M. v. Nanette H.*, 303 P.3d 392, 400 (Alaska 2013) (citing *House*, 779 P.2d at 1206). Travis mentions due process only in his reply brief, and then only cursorily without any legal discussion.

move, we'll take some testimony regarding best interests. I don't expect to make those decisions live here, so I'll hear all of that evidence right now and sort through it." When later in the proceeding Amanda's counsel asked whether it was time for her to turn her attention from the legitimacy of the move to the best interests factors, the court responded, "Please, go ahead." Amanda and her husband testified at the hearing about the benefits of their move, its impact on visitation with Travis, H.'s relationship with his half-brother K., H.'s educational needs, and other aspects of H.'s life. Travis's girlfriend testified about Travis's parenting and his ability to foster a relationship between H. and Amanda. Travis testified about how he spent his time with H., about his family members in Alaska, and about his plans to build a new house next door to his parents. He testified about his sobriety and introduced into evidence his substance abuse and anger management assessments. The court's subsequent written order demonstrates its understanding of the case and a careful consideration of the best interests factors, supported by a discussion of the evidence. And notwithstanding Travis's complaint that he lacked time to call experts, the record does not show that he attempted to call experts at the hearing or made any specific requests for more time.[25]

---

[25] Travis's attorney did make an offer of proof regarding evidence of Travis's time with H. in early childhood. But she did not mention the need for expert testimony. The attorney kept "close track of [her] time" and noted that "with the time I have, I think that's all I can do"; at no time before or during the trial did she ask for more time or identify the evidence Travis was restrained from presenting because of the time limits. "A party's failure to make an offer of proof acts as a waiver of any claim of error regarding the exclusion of unspecified evidence." *AT&T Alascom v. Orchitt*, 161 P.3d 1232, 1245 (Alaska 2007). Offers of proof are especially important for appellants claiming that time limits or other hearing restrictions impeded their presentations. *See Schmidt v. Beeson Plumbing & Heating, Inc.*, 869 P.2d 1170, 1180 n.15 (Alaska 1994) (explaining that appellant's failure to make an offer of proof was "fatal to [his] claim" that the workers' compensation board imposed unreasonable time limits on his

(continued...)

"Subject to the constitutional rights of the litigants, the trial court plainly retains discretionary control of its own calendar, and an appellate court will rightly hesitate to disturb the trial court's rulings on such matters, unless it is clearly shown that this discretion was manifestly abused."[26] No abuse of discretion is evident here. Though the modification hearing was relatively brief, we will not second-guess the superior court's determination that it was sufficient under the circumstances.

---

[25]     (...continued)
presentation of evidence); *Adamson v. Univ. of Alaska*, 819 P.2d 886, 889-90 (Alaska 1991) (explaining that "if appellate review is to be meaningful, a party asserting error in [agency] proceedings must, by making an offer of proof or other appropriate procedural means, afford the appellate tribunal a means of evaluating the claims of error").

[26]     75 AM. JUR. 2D *Trial* § 21 (2017).

## 2. Weighing best interests factors

We next turn to whether the superior court's best interests determination was an abuse of discretion. "The superior court's custody modification decision must be guided by the best interest factors listed in AS 25.24.150(c),"[27] which include the capability of the parents to meet the child's needs; "the love and affection existing between the child and each parent"; stability; each parent's ability to foster a relationship between the child and the other parent (the "fostering factor"); domestic violence; and substance abuse. While the "court cannot assign disproportionate weight to particular factors while ignoring others, it has considerable discretion in determining the importance of each statutory factor in the context of a specific case and is not required to weigh the factors equally."[28]

The superior court in this case found that Amanda "has demonstrated a superior capability to meet [H.'s] needs"; the capability factor therefore favored Amanda. The court found that Amanda "has provided consistent care for [H.] during his life" and "a stable, satisfactory environment for H. since birth" and that "it is desirable to maintain that stable continuity"; the stability factor therefore favored Amanda as well. The court found that the fostering factor favored Amanda because she "does promote a relationship between [H.] and [Travis]," whereas "there is little or no historical record to establish that [Travis] could or would promote" the relationship between H. and Amanda. The court also considered "evidence of domestic violence, anger, and substance abuse";

---

[27] *Andrea C. v. Marcus K.*, 355 P.3d 521, 528 (Alaska 2015) (citing AS 25.24.150(a), (c)); *Barrett v. Alguire*, 35 P.3d 1, 7 (Alaska 2001) ("[T]he legal standard in custody cases where one parent chooses to relocate is the same whether the superior court has an initial custody determination or motion to modify custody before it.").

[28] *Andrea C.*, 355 P.3d at 528 (quoting *Williams v. Barbee*, 243 P.3d 995, 1005 (Alaska 2011)).

although it noted Travis "has taken steps with assessments from" several treatment providers, it concluded that these factors also favored Amanda. The court found that the love factor favored neither parent because "[H.] loves both parents and they love him." But the court did not find that any best interests factors favored Travis.

Travis asserts that the superior court abused its discretion because "it did not properly consider the statutory factors, especially the fostering factor." Travis is correct that this factor may be particularly weighty in the context of long-distance relationships,[29] but we disagree that the court failed to properly consider it. To counter the court's finding that there was little evidence "that [Travis] could or would promote" a relationship between H. and Amanda, Travis points to testimony that he was a more reliable conduit than Amanda was for communication between K. and K.'s father and that he "was completely supportive of" a close relationship between his girlfriend's children and their father. But the superior court found more evidence on the other side of the ledger. The court had earlier noted Amanda's efforts to ensure that Travis continued to see H. even when Travis failed to comply with the orders in place after default. Amanda testified at the modification hearing that "it's best to have two loving families and for you to work together" and that she was willing to work "to keep [Travis and H.'s] bond strong." She proposed sharing visitation costs, having Travis read "goodnight stories" by telephone, setting up video chat sessions, and sending letters. Travis agreed that Amanda is "open to [his] input" on raising their son and that she updates him when he asks.

---

  **29**   *See Silvan v. Alcina*, 105 P.3d 117, 121 (Alaska 2005) ("It is essential to have a custodial parent willing to foster an open relationship with the other parent when a great distance separates the children from the non-custodial parent, and it is reasonable for the superior court to place enhanced importance on this factor when making its decision.").

Travis asserts that the superior court disregarded testimony from K.'s father about difficulties in maintaining contact with K. through Amanda. But K.'s father also testified that more recently he and Amanda had "been working really well together as far as getting to talk to [K.]." Amanda testified that she had an easier time communicating with K.'s father after she and Travis separated. The superior court expressly considered the evidence on this issue, disagreed with Travis's contention that Amanda "did not provide an open, loving" relationship between K. and K.'s father, and found that Amanda did and would promote the relationship between H. and Travis. Because the superior court's finding on the fostering factor primarily relies on oral testimony and therefore "depends almost entirely on [the court's] assessment of [witness] credibility," we give it "particular deference."[30]

Travis also argues that the superior court "did not apparently pay heed to" how well H. was doing in Fairbanks or to Travis's home construction plans.[31] It is true that the court did not mention these specific facts in its order, but it did make the general observation that Travis, "to his credit, has addressed a variety of issues and is becoming more involved in [H.'s] life." We cannot say that the court overlooked any significant evidence or failed to adequately discuss the factors it considered determinative. The court did not abuse its discretion in its decision that moving to Hawaii with Amanda was in H.'s best interests.

---

[30]    *Kristina B. v. Edward B.*, 329 P.3d 202, 214 (Alaska 2014) (citing *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014)).

[31]    Travis also argues that the superior court disregarded "concerns about Amanda's parenting of [H.]" and "an instance of serious alcohol abuse" involving Amanda. But Travis cites his own affidavit for the allegations about Amanda's parenting, not testimony from the hearing. And the allegation of "serious alcohol abuse" refers to testimony that Amanda once called Travis for a ride when she was too drunk to drive, testimony the court could have viewed as favoring Amanda.

#### D.     It Was An Abuse Of Discretion To Modify Legal Custody.

The superior court's order on modification also changed legal custody. Although it found that "[t]he current record supports that the parties should have shared legal custody," the court ordered that "[i]n the event of a dispute regarding a legal custody issue[,] [Amanda] may make the decision on behalf of [H.] but must file a motion to affirm her decision within 10 days." This was a change from the parenting agreement's decision-making mechanism, which required the parents to mediate disputed legal custody issues and to "file a motion with the court to modify [their] parenting agreement" if mediation did not succeed.

Amanda argues that the court did not modify legal custody at all but merely "sharpened the definition of the legal custody parameters." But Travis argues that the change gave Amanda "the ability to usurp and over-ride any [dissension] from" him on legal custody issues. We agree with Travis that the change was more than a simple clarification. A mechanism by which Amanda has the final say, subject to later court approval, gives her the ability to actually effect a change over Travis's disagreement. Although she must then follow up with a motion seeking the court's approval of her decision, the court is then put in the position of reviewing a status quo which it may be hesitant to upend. And because of concerns for his son's stability and continuity, Travis may be less likely to challenge a change that has already gone into effect. In short, the "modified legal custody" that the court imposed, while sometimes the best solution when

written on a blank slate,[32] is clearly a modification of the parties' earlier agreement in this case.

Because Amanda did not seek to modify legal custody, she did not allege facts, or adduce evidence at the hearing, aimed at justifying such a modification; she asserted in her motion that legal custody should remain as it was.[33] Travis thus received no notice that legal custody could be at issue and had no opportunity to present evidence on the subject.[34] And the court did not explain why it believed it necessary to modify the existing decision-making mechanism. While an out-of-state move is a substantial change in circumstances for physical custody purposes, it is not necessarily a substantial change

---

[32] *Ronny M. v. Nanette H.*, 303 P.3d 392, 404-05 (Alaska 2013) (citing the legislative preference for joint legal custody but affirming the award of a "kind of modified shared legal custody" where "[the parents] must communicate with each other and attempt to agree on major decisions affecting the [children's] welfare, but [one parent] is given final decision-making authority should they fail to agree").

[33] We have held that legal and physical custody should be analyzed separately, including in the determination of whether a change in circumstances justifies modification. *Collier v. Harris*, 261 P.3d 397, 403 (Alaska 2011) ("[T]he court lumped together [the parent's] request to modify legal and physical custody, . . . [but] these two types of custody must be analyzed separately.").

[34] *See Debra P. v. Laurence S.*, 309 P.3d 1258, 1261 (Alaska 2013) ("[I]t was a violation of [the parent's] right to due process of law when the superior court made a final custody and visitation decision after a hearing, which [the parent] reasonably believed would resolve only interim custody and visitation issues.").

for legal custody purposes.[35] Although one reason to modify legal custody is "sustained noncooperation by one parent,"[36] Amanda made no such allegations here.[37]

We conclude that it was an abuse of discretion to modify legal custody when neither party requested it, the allegations in support of the modification motion did not support it, and there was no notice that the court would consider it. We therefore vacate the modification of legal custody.

## V.    CONCLUSION

For the foregoing reasons we AFFIRM the superior court's modification of physical custody but VACATE its modification of legal custody.

---

[35]    It is logical that an out-of-state move requires a change in physical custody: distance interferes with frequent exchanges. But given the ubiquity of personal technology, distance is no longer a significant barrier to quick communication or the making of joint decisions about education, health care, and other important child-rearing issues central to legal custody.

[36]    *Collier*, 261 P.3d at 405 (quoting *Peterson v. Swarthout*, 214 P.3d 332, 341 (Alaska 2009)).

[37]    There was some testimony about the parents' ability to communicate with each other, though it was inconsistent and neither one framed it as a legal custody question. For example, Travis testified that he and Amanda "don't communicate much" but also that he contacted her "[e]very other day" when H. was staying with her.