NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| CONNIE S. BENNETT, | ) |
| | ) Supreme Court No. S-18428 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-17-05828 CI |
| v. | ) |
| | ) MEMORANDUM OPINION |
| ERIK HULTGREN, Personal | ) AND JUDGMENT* |
| Representative of the Estate of GYDA | ) |
| HULTGREN, | ) No. 2019 – March 13, 2024 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Josie Garton, Judge.

Appearances: Connie S. Bennett, pro se, Anchorage, Appellant. No appearance by Appellee Erik Hultgren.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

# I. INTRODUCTION

Two neighbors entered into a rental agreement. The renter hoped to buy the property and invested $30,000 – $50,000 in it. After the landlady died, the estate did not sell the renter the property and instead sued the renter for unpaid rent. The renter counterclaimed, asserting that the estate had been unjustly enriched and that the property was not habitable. The superior court ruled in favor of the estate, finding that

---

\*      Entered under Alaska Appellate Rule 214.

there was no purchase agreement, that the renter's expenditures were not authorized, and that the existence of habitability violations had not been established. The renter — representing herself — appeals, repeating the arguments she made in superior court and also alleging that the superior court mismanaged the trial. We affirm the superior court.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Connie Bennett and Gyda Hultgren were neighbors. In April 2016 they reached a six-month agreement for Bennett to rent Gyda's property, which included a house and cottage. Bennett hoped to buy the property and turn it into a vacation rental, a plan she claims Gyda knew and supported. The rental agreement specified that the property would be used "as a private residence [and] retreat vacation space." The written agreement allowed Bennett to deduct maintenance and repair costs under $500 from rent and authorized her to make alterations with Gyda's permission (but without providing for reimbursement). The agreement also included a 45-day right of first refusal to purchase the property. Gyda left Alaska after she and Bennett signed the agreement.

In May or June Bennett concluded — based on the advice of contractors and inspectors she had hired — that the house was in violation of the housing code. She emailed Gyda about buying the property for less than its assessed value, proposing that the costs of fixing the problems be deducted from the sale price. There is no evidence that Gyda responded to the email. Bennett proceeded to spend between $30,000 and $50,000 on maintenance, repairs, and alterations.

Gyda died in October 2016. Her brother, Erik Hultgren,[1] contacted Bennett. Bennett informed Hultgren that she and Gyda had discussed the sale of the property; Hultgren asked for documentation. Hultgren also asked Bennett to pay rent

---

[1]    We refer to Erik Hultgren and the estate as "Hultgren" and Gyda Hultgren as "Gyda."

directly to him, but Bennett declined, stating that she would prefer to pay her rent and take care of repairs "according to the rental contract" until a personal representative of the estate was appointed. In late November Bennett recorded a mechanic's lien against the property for the repairs she had made. By this point Hultgren and Bennett's communications had grown hostile.

In December 2016 Hultgren was appointed personal representative and terminated Bennett's rental agreement shortly thereafter. Around the same time the cottage lost running water, and Bennett informed Hultgren; the cause was not determined. After Bennett vacated the property, Hultgren restored the water and made other repairs, including replacing a cut fence, trimming bushes, disposing of trash, and cleaning. Bennett recorded a second mechanic's lien and also filed a claim against the estate in the probate case.

## B. Proceedings

In April 2017 Hultgren — representing the estate — sued Bennett in district court for unpaid rent, late fees (pursuant to the rental agreement), and damage to the property. Bennett counterclaimed, alleging that the estate was unjustly enriched by her work.[2] She sought repayment and to enforce the right of first refusal in the rental agreement. Bennett's lawyer withdrew in January 2018.

In January 2018 the district court granted partial summary judgment for Hultgren, declaring Bennett's mechanic's liens invalid but ruling that her claims were not foreclosed. The case was subsequently removed to superior court. In April Bennett amended her complaint to include claims involving her security deposit, loss of business income, and damage to the property. And in July she recorded a lis pendens against the

---

**2**     Bennett had also filed a small claims case against Hultgren that was consolidated with this case before trial.

property.[3]  The property went into foreclosure and eventually sold in 2019, after the lis pendens was expunged.

In May 2019 Hultgren's lawyer, who had withdrawn a year earlier, reentered the case.  In September the superior court granted summary judgment to Bennett on her claim that Hultgren violated the Alaska Uniform Residential Landlord and Tenant Act[4] (URLTA) by failing to return her security deposit or provide an itemized letter detailing why.  But it denied summary judgment on her claims that she had a right to purchase the property "outside the lease term," for management fees, for reimbursement related to her work, and for lost income due to its unsuitability for her intended use.[5]

The court held a one-day trial in October 2020.  Hultgren testified but Bennett did not appear.  The court found her in default and awarded Hultgren over $12,000 in damages plus attorney's fees.  Bennett moved for reconsideration, asserting that she had difficulties with remote technology, that the court had failed to update and notify her about the logistics of trial, and that she had health issues that prevented her from participating.  The court expressed some skepticism but granted the motion in February 2021.  It noted Bennett's self-represented status and acknowledged its own communication missteps.  The court vacated the default judgment and scheduled trial.

Hultgren and Bennett each testified and called witnesses during a two-day trial in May 2021.

---

[3]  Filing a lis pendens against a piece of real property places a future interest holder on notice that the property is the subject of litigation.  *See* AS 09.45.940.

[4]  AS 34.03.070.

[5]  In December the court granted Hultgren's motion for reconsideration of an October 2018 order dismissing several of his claims, noting that he was unrepresented and hospitalized during that time.  The court also set aside a ruling deeming several discovery requests admitted for a lack of response.

### 1. Hultgren and his witness

Hultgren testified that after Bennett told him that she and Gyda had a purchase agreement, he asked her to forward that information to his lawyer. Hultgren stated that he asked for the information several times but Bennett never provided it. He testified that although he told Bennett she could continue as a renter, he also informed her that he could not yet make a decision about selling the property. He said that after going through his sister's records, he realized that Bennett owed unpaid rent. And he reported that even though Bennett agreed to continue paying rent and sent monthly payments, she fell "far short" of paying actual rent. He also described subsequent inspections of the house and its eventual sale. Hultgren also called Alan Clevenger, who had performed repairs on the property, to testify about the work he did and its cost.

### 2. Bennett and her witnesses

Bennett recalled Hultgren and questioned him about an inspection report that she had forwarded to him. Hultgren testified that he did not do anything based on Bennett's report and instead he made repairs in response to inspections he commissioned during the sale of the property. Hultgren described checks Bennett had sent but denied knowledge of the costs and deductions that she claimed. At Bennett's request Hultgren also read aloud vulgar and threatening texts about her between him and Clevenger. In response to questions from his own lawyer on cross-examination, he repeated the amount of unpaid rent Bennett owed and said he never found a lawnmower for which she sought reimbursement.

Bennett called a municipal code enforcement officer and a private home inspector she had hired.[6] The code enforcement officer testified that any replacement windows would be required to meet the housing code's specifications.

---

[6] She also called a representative from the municipal utilities department about the loss of running water.

The home inspector testified that he had found 16 items that, in his opinion, presented "life safety" issues. On cross-examination the inspector testified that in 23 years and 17,000 inspections, he had only performed 12 home inspections that did not reveal any life safety issues. On redirect he stated that the fact that most homes had such issues did not make them less relevant.

Bennett then testified. She described her friendship with Gyda and stated that when Gyda suddenly decided to move out of Alaska, the two of them had a rushed conversation about Bennett purchasing the property. She testified that they decided to do a rental agreement while they worked out details of the sale and described repairs and alterations that Gyda approved. Bennett described the condition of the property and her plan to turn it into a "spiritual and meditation retreat[] as well as a vacation rental property."

Bennett listed the improvements she made to the property, including changing the locks, ordering new appliances, and replacing fixtures in the bathroom and kitchen. She testified that Gyda preferred talking on the phone and did not put most things in writing, suggesting that this was why there was so little written communication from Gyda to her. And she reported that because Gyda had been concerned about her own finances, she had considered reimbursing Bennett by lowering the sale price. Bennett also acknowledged that Gyda's health began deteriorating around this time.

Bennett then described her relationship with Hultgren, saying that as soon as he contacted her, she informed him that she had spent money on the property and wanted to purchase it. She described him as focused on getting rent and documents and recounted that he accused her of lying. She testified that she had consulted with a lawyer who told her she was "in legal limbo" with the property, but that she decided to continue paying for utilities and deducting the cost from her rent.

On cross-examination Bennett read parts of the rental agreement aloud but disagreed with Hultgren's lawyer that her work was unauthorized, noting that the agreement did not require written authorization. She maintained that she did not make

any alterations beyond what was specified in the rental agreement and that all alterations were preapproved by Gyda. But she acknowledged on further questioning that the agreement did not contain a dollar amount and that she had nothing in writing, aside from text messages not in the record, showing that Gyda requested the changes. She also asserted that even though they "didn't have a formalized purchase and sale agreement," she and Gyda "had an agreement that I would purchase the property" and "were negotiating how that purchase was going to take place." Bennett acknowledged that there was no signed document and denied telling Hultgren that one existed. Bennett stated that she had never personally resided at the property and that she had rented it out one time. She denied that the property was habitable during that time, and on rebuttal pointed out that she stopped advertising it as a rental as soon as she learned about the code violations.

Hultgren made an oral closing argument; Bennett filed hers in writing. She also filed a motion for reconsideration, arguing that the court's decision to shorten the trial by a day, as well as its decision to conduct the trial by phone due to a cyber-attack on the court system, prejudiced her.

### 3. Findings and conclusions

The court issued Findings of Fact and Conclusions of Law in October 2021. It awarded Hultgren damages for unpaid rent but reduced the amount to account for certain maintenance and repair costs, as well as for the time during which the cottage lacked water.[7] It denied all of his claims for damages except for $275 to repair the fence that Bennett had cut. And it found that Bennett's mechanic's liens were invalid and had damaged the property by delaying its sale; it declined to reach the issue of the lis pendens. But because Hultgren had not presented sufficient evidence to allow the court to calculate damages for this delay, it awarded $1 in nominal damages.

---

[7] The court found that the water shut off amounted to a failure to maintain fit and habitable premises under AS 34.03.100(a)(5).

The court found that Bennett had not proven her unjust enrichment claims, because there was neither proof that Gyda had authorized repairs nor an actual agreement to buy the property. And it found that there was no evidence Bennett's alterations had actually conferred a benefit to the estate. The court also noted that because the rental agreement preapproved some alterations without providing for reimbursement, "it would not be unjust for the Estate to retain any benefit because that is precisely what the contract contemplated."

The court further found that Bennett had not shown that the size of the windows — the code violation on which she relied — was a habitability violation. And the court denied Bennett's remaining claims. It found she was not entitled to compensation for managing the property because "she was a tenant, not a property manager." It denied her compensation for paying utilities because "the contract obligated her to pay utilities." It found that Bennett's claims for commercial damages were both unsupported and inconsistent with her URLTA claims (on which she had prevailed in district court). And it found that although the original rental agreement had included a right of first refusal, "there was no evidence . . . that Gyda . . . or her Estate ever had a duty to sell Ms. Bennett the property." The court also denied Bennett's motion for reconsideration based on administration of the trial.

The court awarded the estate $6,576 in damages, and after adding attorney's fees, issued a final judgment in April 2022 for a total of $17,554.18 in damages, interest, and fees. The court reduced the amount of attorney's fees the estate requested, deducting charges from the time during which Hultgren's counsel was withdrawn, charges that were for work on other matters, and charges based on Hultgren's delay in paying his counsel.

Bennett, representing herself, appeals, alleging a number of factual errors, legal mistakes, and abuses of discretion by the superior court.[8]

## III. STANDARD OF REVIEW

A court's factual findings are reviewed for clear error, as are damages calculations.[9] The interpretation of a statute is a legal question to which we apply our independent judgment.[10] "Subject to the constitutional rights of the litigants, the trial court . . . retains discretionary control of its own calendar, and an appellate court will . . . hesitate to disturb the trial court's rulings on such matters, unless it is clearly shown that this discretion was manifestly abused."[11]

Superior courts have "broad discretion in awarding attorney's fees," and "this court will not find an abuse of discretion absent a showing that the award was arbitrary, capricious, manifestly unreasonable, or stemmed from improper motive."[12]

## IV. DISCUSSION

Bennett challenges all of the court's findings and conclusions that were unfavorable to her. She also argues that the superior court abused its discretion in administering the trial. Because she is self-represented, we apply "less stringent" standards to her brief, "so long as the essence of [her] argument can be easily discerned from the briefing, and the opposing party would not be prejudiced by its

---

[8] Hultgren has not participated in this appeal, and his attorney filed a notice of non-representation.

[9] *Burton v. Fountainhead Dev., Inc.*, 393 P.3d 387, 392-93 (Alaska 2017).

[10] *Guilford v. Weidner Inv. Servs.*, 522 P.3d 1085, 1093 (Alaska 2023).

[11] *Judd v. Burns*, 397 P.3d 331, 339 (Alaska 2017) (quoting 75 AM. JUR. 2D *Trial* § 21 (2017)).

[12] *Oakley Enters., LLC v. NPI, LLC*, 354 P.3d 1073, 1079 (Alaska 2015) (quoting *United Servs. Auto. Ass'n v. Pruitt ex rel. Pruitt*, 38 P.3d 528, 531 (Alaska 2001)).

consideration."[13]   We group Bennett's points on appeal into four categories: (1) whether the estate was unjustly enriched; (2) whether she owes unpaid rent or conversely whether the estate owes her rent or damages; (3) whether the superior court mismanaged the trial; and (4) whether attorney's fees were calculated correctly.

## A.   The Superior Court Did Not Err By Finding That The Estate Was Not Unjustly Enriched.

Bennett argues that the superior court erred by finding there was no unjust enrichment.  She argues that Gyda understood her intentions and that the estate profited from her improvements.  The superior court found that "[t]he only evidence Ms. Bennett presented was her own statements" and "the record does not contain any statements by Gyda tending to show Gyda's agreement to the sale or to the specific terms described by Ms. Bennett."  It acknowledged that "[i]t is clear that Ms. Bennett wanted to purchase the property, and that she may have undertaken some of the expenses based on her desire to purchase the property."  But it concluded that, "under the contract [Bennett] drafted and the parties signed, Ms. Bennett assumed the risk that if she did not ultimately purchase the property, she would not be reimbursed for the costs of altering it."

The existence of unjust enrichment is generally a factual question,[14] and the superior court's finding here was not clear error.  "The general rule is clear:  in the absence of anything to show that the landlord ordered or authorized the work, ratified the work after it was done, or was in such a close relationship to the tenant that it can be said that the contract was executed for the landlord's benefit, a plaintiff cannot

---

[13]     *Leahy v. Conant*, 447 P.3d 737, 742-43 (Alaska 2019) (quoting *Adkins v. Stansel*, 204 P.3d 1031, 1033 (Alaska 2009)).

[14]     *In re Est. of Rodman*, 498 P.3d 1054, 1062-63 (Alaska 2021).

collect from the landlord under a claim of unjust enrichment, even where the landlord knowingly acquiesced in and ultimately benefits from the work performed."[15]

Bennett asks us to reverse the superior court based on her sworn testimony that Gyda wanted to sell her the property and that Gyda authorized her to make the improvements. But the evidence demonstrated only that Bennett informed Gyda about various projects and requested updates on a potential purchase. There was no evidence of any responses from Gyda to corroborate Bennett's belief.[16] The superior court did not clearly err by finding that the estate was not unjustly enriched.[17]

## B.    The Superior Court Did Not Err By Awarding The Estate Damages For Bennett's Unpaid Rent.

Bennett disputes that she owes the estate money, arguing that the property was uninhabitable. She argues that the undersized egress windows violated the relevant housing code, which amounted to a habitability violation. She argues that the violation breached the rental agreement, prevented the delivery of possession, and prevented her from using the property as she planned. As a result Bennett claims that she is entitled to damages and rent abatement. The superior court found that there was "conflicting evidence" about whether the windows were a habitability violation and that Bennett had "not demonstrated that she is entitled to abatement of rent for damages related to the windows."

---

[15]     *Frontier Rock & Sand, Inc. v. Heritage Ventures, Inc.*, 607 P.2d 364, 368 (Alaska 1980).

[16]     Bennett herself acknowledged that there was no signed purchase and sale agreement, saying only that there were negotiations "to purchase the property with considerations made as to the expenditures Bennett made and would have to make."

[17]     The superior court also did not "ignor[e]" evidence of the amounts Bennett spent on the property and utilities. The amount was relevant only to calculate reimbursement owed to Bennett; because the court found that the estate had not been unjustly enriched, there was no reimbursement due.

Whether a particular housing code violation rises to the level of a habitability violation is a factual finding for the superior court, which we review for clear error.[18] The evidence presented was inconclusive and conflicting as to the effect of undersized egress windows on habitability. While the property violated a municipal policy setting requirements for egress windows,[19] the house was built before the code was adopted in 1964 and, according to Hultgren, sold without the need for new windows. The court also heard testimony from an Anchorage code abatement officer suggesting that the windows at issue would only need to be brought into compliance with housing code upon their replacement. When the trial court "makes factual findings that, as here, are supported by the record, we do not reweigh the conflicting evidence."[20] The superior court did not clearly err.[21]

Bennett also argues that the superior court erred by requiring her to pay damages for unpaid rent because the estate failed to itemize unpaid rent and damages in a letter to her within 30 days of the termination of her lease.[22] Without this letter, she argues, it cannot now recover money from her. But we have previously rejected almost the same argument because it "reads the [URLTA] far too broadly."[23] URLTA

---

[18] *Dinh v. Raines*, ___ P.3d ___, Op. No. 7688, 2024 WL 741581 (Alaska Feb. 23, 2024).

[19] *See* Anchorage, Policy A.01 (December 10, 2020).

[20] *Pasley v. Pasley*, 442 P.3d 738, 752 (Alaska 2019).

[21] Bennett also argues that she is owed damages because the property was unusable as a rental due to the windows. But the court expressly found, and awarded Bennett damages based on a residential, rather than commercial, lease to which URLTA applied. That finding is not being appealed.

[22] *See* AS 34.03.070(b).

[23] *Fyffe v. Wright*, 93 P.3d 444, 452 (Alaska 2004) (responding to argument that "*any* possible recovery by a landlord for damage to property . . . must be itemized and sent to the tenant within the statutory period") (emphasis in original), *partially*

"regulates only a landlord's ability to deduct damages and unpaid rent *from a tenant's security deposit.*"[24] Bennett prevailed on her security deposit claim.

Bennett also argues that Hultgren waived his claims or should be estopped from bringing them because he did not mitigate his damages and has "unclean hands."[25] Bennett does not describe how Hultgren could have mitigated his damages, focusing instead on her belief that she was penalized for taking care of the property even though she could not use it as she intended.[26]

But the court did not penalize Bennett. When it calculated the damages owed to the estate based on unpaid rent, it deducted the cost of certain repairs and improvements Bennett had made. The court's rejection of Bennett's argument that she was "entitled to compensation for managing the property and paying utilities" was based upon the written rental agreement. And Bennett herself testified that she was advised by a lawyer that she was "in legal limbo" but chose to keep paying for utilities. The court did not err by permitting Hultgren's claims to proceed.

## C. The Superior Court's Trial And Evidentiary Decisions Were Not Abuses Of Its Discretion.

Bennett raises a number of concerns about the trial. She first asserts that the change from a three-day videoconference to a two-day trial conducted only by

---

*disavowed on other grounds by Burton v. Fountainhead Dev., Inc.*, 393 P.3d 387, 393 n.20 (Alaska 2017).

[24]     *Id.* (emphasis added).

[25]     "To successfully raise the unclean hands defense under Alaska law, a defendant must show: (1) 'that the plaintiff perpetrated some wrongdoing'; and (2) 'that the wrongful act related to the action being litigated.'" *Brooks v. Hollaar*, 297 P.3d 125, 131 (Alaska 2013) (quoting *Henrichs v. Chugach Alaska Corp.*, 250 P.3d 351, 540 (Alaska 2011)).

[26]     Bennett takes issue with Hultgren's hostility toward her and failure to express any gratitude for the work she did. Although the mutual hostility undoubtedly made their interactions more difficult, it does not amount to a failure to mitigate damages.

telephone happened with such short notice that she was unable to call all of her witnesses. She asserts that she had to cut several witnesses from her case because she would not have had time to call them. And she argues that the court should have instructed her how to formally request a change in trial time and length to address her concern. The record reflects that the court heard, considered, and rejected her arguments for additional time.

"Subject to the constitutional rights of the litigants," the superior court has discretion over its calendar; we "hesitate to disturb [its] rulings on such matters, unless it is clearly shown that this discretion was manifestly abused."[27] In this case Bennett's final witness list contained seven named witnesses and three unnamed witnesses.[28] She presented four witnesses: Hultgren, two municipal employees, and herself. Of the remaining six, Hultgren called one, and Bennett cross-examined him. Another was an additional municipal employee.[29] The court excluded another witness because Bennett failed to provide timely notice of her.[30] Bennett asserted that her remaining witnesses would testify about work performed on the property and associated costs and the

---

[27]     *Judd v. Burns*, 397 P.3d 331, 339 (Alaska 2017) (quoting 75 AM. JUR. 2D *Trial* § 21 (2017)).

[28]     It also listed "[a]ny and all witnesses necessary for rebuttal or impeachment purposes," as well as "[a]ny and all witnesses necessary for authentication of documents or records."

[29]     Bennett listed an unnamed representative from the Division of Corporations, Business and Professional Licensing. She does not describe why she wished to call someone from this department, but she did question a code abatement officer about whether a license is needed for contractor services.

[30]     Bennett repeatedly asked the court to let her call her as a "rebuttal witness," noting that she had listed "[a]ny and all witnesses necessary for rebuttal or impeachment purposes." But the deciding factor for whether a rebuttal witness can be called without prior notice is "whether the testimony sought to be rebutted could reasonably have been anticipated prior to trial." *Johnson v. J.G. Pattee, Inc.*, 426 P.3d 1096, 1101 (Alaska 2018) (quoting *Sirotiak v. H.C. Price Co.*, 758 P.2d 1271, 1277 (Alaska 1988)).

condition of the property, especially as it related to possible damage. But exclusion of this testimony is unlikely to have prejudiced Bennett, given that the claims related to it were either decided in her favor or rejected on legal grounds. Under these circumstances we are not persuaded that the superior court abused its discretion in shortening the trial, even if it did not explain its reasoning.

Bennett also argues that she was prejudiced by the change from videoconference to telephone. Court proceedings by phone have been routine in Alaska for decades — so much so that they generally do not present a due process concern.[31] Court rules specifically authorize telephonic participation in civil cases as long as there is good cause and no prejudice.[32] The court here had exceptionally good cause: a cyber-attack on the court system made videoconferencing impossible. The issue therefore is whether the change of format actually prejudiced Bennett. We are not persuaded that it did.

Bennett argues that appearing by telephone meant that she had to refer individually to each of the hundreds of photographs she offered, rather than being able to display a number of them at once by video. She claims that this prevented her from effectively making her case.[33] She points out that she was not able to show all of her photographs to witnesses during their testimony, although she did admit them in evidence. She also accurately observes that the court did not mention those photos in its findings and conclusions.

Bennett fails to recognize that the photographs were in evidence and therefore reviewable. But they were not relevant to the court's decision. They showed, in detail, the significant improvements Bennett made to the property. She argues that

---

[31]     *See In re Triem*, 929 P.2d 634, 642 (Alaska 1996).

[32]     Alaska R. Civ. P. 99(a).

[33]     She also raises unsubstantiated concerns about Hultgren being "coached" by his counsel.

they show that she "conferred a benefit to the Property . . . [and] estate." The photographs do not, however, shed any light on whether there were habitability violations or whether Gyda approved or authorized the improvements. The court found that the estate had not been unjustly enriched, so the photographs that might have helped to calculate the value of unjust enrichment were no longer relevant. Bennett was not prejudiced by her inability to display photographs by video.

Bennett also alleges that the court inappropriately relied on extra-record evidence in its findings and conclusions. She points to the court's references to the property's eventual purchase and accompanying inspection reports, which were not admitted into evidence. But Hultgren testified about them at trial without objection, and "[i]nformation to which witnesses testified, without objection, is evidence."[34]

Bennett also takes offense that the court — and Hultgren's counsel without correction from the court — referred to her as "Ms. Hultgren" on several occasions, both orally and in writing in the court's findings and conclusions. She asserts this reflects a lack of attention to detail. Although such a mistake is unfortunate and its repetition is more concerning than the written error we addressed in a recent case,[35] these mistakes appear to be errors made in the course of lengthy litigation that caused no prejudice and did not reflect judicial bias.[36]

---

[34] *In re Hospitalization of Rabi R.*, 468 P.3d 721, 733 (Alaska 2020).

[35] *See Layton v. O'Dea*, 515 P.3d 92, 110 (Alaska 2022) (noting that court's referring to party by wrong first name in written decision, though "unfortunate mistake," was "ultimately a scrivener's error that did not prejudice [that party] and, without more, [did] not reveal bias against him.").

[36] *See Downs v. Downs*, 440 P.3d 294, 300 (Alaska 2019) ("[J]udicial bias may . . . arise during the course of judicial proceedings if 'a judicial officer hears, learns, or does something intrajudicially so prejudicial that further participation would be unfair.' ") (quoting *Brown v. State*, 414 P.3d 660, 661 n.3 (Alaska 2018) (Winfree, J., concurring in part and dissenting in part)).

Bennett further accuses the court of engaging in ex parte communication with Hultgren; she says the court sent him "[a] letter, not provided to Bennett" and/or "encouraging motions . . . for him to respond to Bennett's summary judgment motion." Bennett does not specify the letter to which she refers, but the "encouraging motion[]" appears to be an order simply setting a deadline for Hultgren to respond. The court mailed the order to Bennett; it was therefore not an ex parte communication.

Finally, Bennett argues that the court improperly treated Hultgren with the lenience due to a self-represented litigant even though he was represented by a lawyer. She alleges that Hultgren's lawyer continued to represent him even after the court had permitted him to withdraw from the case. She also argues that the lawyer should not have been allowed to reenter the case and that she should have had the "opportunity to argue his reentry with the court." Bennett appears to believe that because the lawyer continued to represent Hultgren in the related probate case, he remained Hultgren's lawyer in this case as well. But Bennett does not seem to recognize that when an individual is involved in more than one case, the lawyer in any one of those cases does not necessarily represent that individual in others.[37] Because Hultgren was not represented in this case between the time his lawyer withdrew and the time he reentered the case, the court did not abuse its discretion by holding Hultgren to the less stringent requirements to which it also held Bennett.[38]

---

[37] *See* Alaska R. Civ. P. 81(c)-(e) (describing how attorneys enter appearances or withdraw as counsel in the context of specific cases, actions, and proceedings).

[38] Bennett argues that she did not receive proper notice of the lawyer's resumed representation of Hultgren. Even if this were true, she was not entitled to contest it.

**D.     The Superior Court Did Not Abuse Its Discretion By Awarding Hultgren Attorney's Fees.**

Bennett argues that the superior court awarded Hultgren attorney's fees for work his attorney did on other cases and for hours after the attorney had withdrawn but before he reentered the case.  But Bennett made both of these arguments to the superior court and the court agreed with her.  In response to Bennett's motion, the court specifically stated that it "w[ould] not award [Hultgren] any part of any fees incurred between [the date] when [Hultgren's lawyer] withdrew from . . . this matter, and [the date] when [he] filed a second entry of appearance."  The court ordered Hultgren to "recalculate [his] attorney's fees, removing any items that involve services performed for [the other case]."  The superior court did not abuse its discretion.

**V.     CONCLUSION**

We AFFIRM the superior court's decisions.